COASTAL TERMINALS, INC., Appellee,

v.

UNITED STATES of America, Appellant.

No. 8990.

United States Court of Appeals Fourth Circuit.

Argued June 4, 1963.

Decided July 12, 1963.

**334**

Alec A. Pandaleon, Atty., Dept. of Justice (Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson and Harry Baum, Attys., Dept. of Justice, Terrell L. Glenn, U. S. Atty., and Thomas P. Simpson, Asst. U. S. Atty., on brief), for appellant.

Arthur G. Howe, Charleston, S. C. (George E. Grimball, Jr., and Gedney M. Howe, Jr., Charleston, S. C., on brief), for appellee.

Before HAYNSWORTH and J. SPENCER BELL, Circuit Judges, and BARKSDALE, District Judge.

BARKSDALE, District Judge.

Coastal Terminals, Inc., a South Carolina Corporation, duly filed its income tax return for the fiscal year ending June 30, 1957, and paid the tax shown by the return to be due. Thereafter, the District Director of Internal Revenue, Columbia, S. C., asserted a deficiency in the income tax paid, which deficiency the taxpayer paid under protest, and filed its claim for a refund. Upon disallowance of its claim for refund, the taxpayer instituted this action in the District Court for the Eastern District of South Carolina to recover the amount paid by reason of the deficiency assessment. A trial being had by the court without a jury, the court found the facts specially, stated separately its conclusions of law thereon, and entered judgment in favor of the taxpayer for the amount sued for. From this adverse judgment, the United States of America has prosecuted this appeal.

A number of years prior to 1957, a group of independent oil jobbers formed the corporation, Coastal Terminals, Inc., for the purpose of having it provide facilities for the storage of oil and other petroleum products. In 1957, and for a number of years prior thereto, Coastal Terminals owned and operated a deep-water oil terminal at North Charleston, S. C., the facility consisting of real estate, tanks, pipe lines and office space. Prior to 1957, Coastal Terminals determined that it was to its advantage, and to the advantage of its oil jobber stockholders, to acquire inland terminal facilities, to be supplied with oil by Plantation Pipe Line. To this end, Coastal obtained options on three sites contiguous to Plantation Pipe Line which would be suitable for the erection of terminal facilities. The first such site, upon which an option was taken in December, 1955, was at Belton, S.C. Later options were taken on sites at Salisbury, N.C., and Doraville, Ga. There was existing at this time an operating terminal at Wilmington, N.C., which was owned by Coastal Terminals of North Carolina, a separate and distinct corporation of which the taxpayer owned 60% of the stock and which it hoped to acquire and own outright in the future. Although at that time the taxpayer, Coastal Terminals, had no funds available for the purchase of the sites upon which options had been taken or for the erection of terminal facilities on such sites, as steel was in short supply, the taxpayer obtained commitments from its principal supplier, Chicago Bridge and Iron Company, for the necessary steel, it being understood between Chicago Bridge and Coastal that these commitments might be cancelled if Coastal subsequently found itself unable to finance the purchases. As early as August 1956, Coastal obtained commitments from Chicago Bridge for steel construction at the Belton and Doraville locations.

In the Spring of 1957, Delhi-Taylor Oil Corporation approached Coastal with the view of purchasing Coastal's oil terminal facilities at Charleston. Delhi-Taylor, a Delaware corporation, had its principal offices in Dallas, Texas, and, operating as an independent oil company, was engaged in exploration, production, refining and marketing activities. At the outset, Delhi-Taylor offered to purchase Coastal's terminal facilities at Charleston for $1,000,000.00 cash, and Coastal's asking price was $1,475,000.00. Eventually, Delhi-Taylor offered $1,200,000.00, and Coastal refused to sell for less than $1,400,000.00. At that time it was Coastal's intention to continue in the oil business, but it had no available funds to convert the sites on the Plantation Pipe Line, on which it had taken options,

into operating terminals, and Coastal did not consider Delhi-Taylor's offering price of $1,200,000.00 enough to accomplish that end. Since Coastal and Delhi-Taylor could not agree on a sale, the idea of an exchange of properties was suggested and was discussed. These discussions resulted in an agreement that Delhi-Taylor would acquire from Coastal Terminals of North Carolina, its terminal in Wilmington, N.C., the sites at Belton, N.C., Salisbury, N.C., and Doraville, Ga., construct terminals on the sites, and exchange these four terminals for Coastal's deep water terminal in Charleston.

On May 11, 1957, Coastal and Delhi-Taylor entered into a written agreement entitled, "The State of South Carolina, Terminal Purchase and Sale Contract, Charleston, South Carolina". This agreement provided for the sale of taxpayer's Charleston facilities to Delhi-Taylor for a cash consideration of $1,200,000.00, with an escrow deposit of $60,000.00 as earnest money. The agreement further provided:

"* * * It is understood that Seller is endeavoring to arrange for an exchange of like properties consisting of terminal facilities at Wilmington, Charlotte and Salisbury, North Carolina and Belton, South Carolina between the parties in lieu of the aforementioned cash consideration or some part thereof, such exchange arrangement to be fully capable of completion on or before July 1st, 1957, but unless Seller shall present, and Purchaser shall at its sole option accept, such arrangement to exchange like property in lieu of payment of the cash consideration aforementioned, prior to the 20th day of June 1957, then this contract shall be closed upon the terms and conditions otherwise elsewhere herein set forth. * * *

"IV.

"Subject to the approval of title by Purchaser's attorneys, and in the event Purchaser's attorneys and the Surveyor find Seller's title to be good and marketable and free and clear of all liens, encumbrances, restrictions and encroachments, and in the further event that Seller has complied with and performed all other terms and conditions hereof, Purchaser shall close the transaction on or before July 1, 1957 * * *, by paying to the Seller the One Million, Two Hundred Thousand Dollar ($1,200,-000.00) purchase price or exchanging property of like kind and value, if such exchange of property can be arranged, less the down payment, or earnest money hereinabove mentioned, at which time Seller will deliver to Purchaser its general warranty deed conveying to Purchaser a fee simple title free and clear of all liens, encumbrances, restrictions and encroachments. * * *"

This contract was drawn by Delhi-Taylor's counsel, no attorney for Coastal having participated in the preparation of the contract, and Delhi-Taylor was most interested in being assured that it would acquire Coastal's Charleston terminal on July 1, 1957. Notwithstanding the fact that the written agreement apparently gave Delhi-Taylor the option of acquiring Coastal's Charleston terminal, either by purchase for cash or by exchange, the testimony of both Coastal's and Delhi-Taylor's negotiating representatives is clear and positive that a sale for cash could not be agreed upon, and that their definite agreement was for an exchange of properties. Thereafter, Coastal assigned its options to purchase the sites on Plantation Pipe Line to Delhi-Taylor, assigned its commitments for steel from Chicago Bridge and Iron Company to Delhi-Taylor, Delhi-Taylor contracted with Kaminer Construction Company for the construction and installation of pipe connections with the storage tanks, and acquired from Coastal Terminals of North Carolina its existing terminal at Wilmington. The construction of the terminal facilities at the three sites on Plantation Pipe Line proceeded promptly, with Delhi-Taylor checking on the engineering details so that the terminals would be acceptable to Coastal, and by

July 1, 1957, the terminals and connections had been substantially completed. On or prior to July 1, 1957, Delhi-Taylor paid for and conveyed the four terminals to Coastal, and Coastal conveyed its deepwater terminal at Charleston to Delhi-Taylor.

The District Judge, sitting as the trier of facts without a jury, found that:

"The substance of the transaction was one in which plaintiff owned a deepwater terminal which Delhi-Taylor Oil Corporation wanted to acquire; they were unable to agree upon a sale; that as a result of prior corporate investigation and planning, which at the time had no connection with this transaction, plaintiff knew of certain property which it would be willing to accept in exchange for its terminal provided Delhi-Taylor Oil Corporation would acquire and improve the same, and that Delhi-Taylor did acquire and improve the same on its own behalf so that it would be in a position to make an exchange, and that an exchange in fact took place. Plaintiff did not 'cash in' and invest the same in another business nor did it receive cash and reinvest the same in like property, but merely exchanged its property with Delhi-Taylor Oil Corporation for like property and continued on as before in its identical business."

Even if it be conceded that upon the testimony different ultimate facts might have been found, we must give due consideration to findings of the District Judge. Rule 52(a) provides that, "Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." Not only are we unable to say that the District Judge's findings of fact were clearly erroneous, but we are of the opinion that upon the evidence his findings were plainly right.

The Government contends that the transaction between Coastal and Delhi-Taylor was a "sale" for gain, the gain from which is recognizable under Section 1002 of the Internal Revenue Code of 1954, which is as follows:

"Except as otherwise provided in this subtitle, on the sale or exchange of property the entire amount of the gain or loss, determined under Section 1001, shall be recognized." 26 U.S.C.A. § 1002.

On the other hand, the taxpayer contends that the transaction was an "exchange" within the meaning of Section 1031(a), which, so far as pertinent, is as follows:

"(a) *Nonrecognition of gain or loss from exchanges solely in kind.* —No gain or loss shall be recognized if property held for productive use in trade or business or for investment \* \* \* is exchanged solely for property of a like kind to be held either for productive use in trade or business or for investment."

The Government alternately contends that, even if the transaction be deemed an "exchange" within the meaning of Section 1031(a), the gain nonetheless is partially taxable under Section 1031(b) and (d) to the extent of certain liabilities of the taxpayer assumed by Delhi-Taylor. These sections are:

"(b) *Gain from exchanges not solely in kind.*—If an exchange would be within the provisions of subsection (a), of section 1035(a), or of section 1036(a), if it were not for the fact that the property received in exchange consists not only of property permitted by such provisions to be received without the recognition of gain, but also of other property or money, then the gain, if any, to the recipient shall be recognized, but in an amount not in excess of the sum of such money and the fair market value of such other property. \* \* \*

"(d) *Basis.* \* \* \* For purposes of this section, section 1035 (a), and section 1036(a), where as part of the consideration to the taxpayer another party to the exchange

assumed a liability of the taxpayer or acquired from the taxpayer property subject to a liability, such assumption or acquisition (in the amount of the liability) shall be considered as money received by the taxpayer on the exchange." 26 U.S. C.A. § 1031.

The taxpayer disagrees with this contention and insists that at the time the exchange was agreed upon, it had incurred no obligations to either Chicago Bridge or Kaminer, and that the obligations incident to the undertaking to construct terminals to be exchanged were entirely the obligations of Delhi-Taylor.

The purpose of Section 1031(a), as shown by its legislative history, is to defer recognition of gain or loss when a direct exchange of property between the taxpayer and another party takes place; a sale for cash does not qualify as a nontaxable exchange even though the cash is immediately reinvested in like property.

We are of the opinion that, upon the evidence, the District Court's findings of fact and conclusions of law were amply sustained by the authorities.

> "Whether the transaction constituted a sale or an exchange for income tax purposes depends on the intent of the parties and this intent is to be ascertained from all relevant facts and circumstances, and of necessity the case is largely dependent upon circumstantial evidence."

Sarkes Tazian, Inc. v. United States, (7th Cir.), 240 F.2d 467, 470.

> " * * * the transaction must be viewed as a whole, and each step, from the commencement of negotiations to the consummation of the sale, is relevant."

Commissioner of Internal Revenue v. Court Holding Co., 324 U.S. 331, 334, 65 S.Ct. 707, 708, 89 L.Ed. 981.

> "The transaction here involved may not be separated into its component parts for tax purposes. Tax consequences must depend on what actually was intended and accomplished rather than on the separate steps taken to reach the desired end."

Century Electric Co. v. Commissioner of Internal Revenue (8th Cir.), 192 F.2d 155, 159.

There was no impropriety or illegality in the undertaking of Delhi-Taylor to exchange property which it did not own at the time of the undertaking. Howell Turpentine Co. v. Commissioner of Internal Revenue, 162 F.2d 319, wherein (p. 322) the court quotes with approval from American Jurisprudence, the following:

> " 'It is not unusual for persons to agree to convey by a certain time notwithstanding they have no title to the land at the time of the contract, and the validity of such agreements is upheld. In such cases the vendor assumes the risk of acquiring the title and making the conveyance, or responding in damages for the vendee's loss of his bargain. * * * Whenever one is so situated with reference to the tract of land that he can acquire the title thereto, either by the voluntary act of the parties holding the title, or by proceedings at law or in equity, he is in position to make a valid agreement for the sale thereof without disclosing the nature of this title.' 55 Am.Jur., Vendor and Purchaser, § 12".

In accord are Mercantile Trust Co. & Nelson v. Commissioner of Internal Revenue, 32 B.T.A. 82; W. D. Haden Co. v. Commissioner of Internal Revenue, 165 F.2d (5th Cir.) 588, and Alderson v. Commissioner of Internal Revenue (9th Cir.), 317 F.2d 790.

The Alderson case, supra, so far as we know, is the latest decision on the question presented in the instant case. The Tax Court (38 T.C. 215) held that the transaction was a taxable sale and not an exchange within the purview of Section 1031(a) of the Revenue Code. Counsel for the Government relied heavily on this decision in their brief in the instant case. However, prior to the argument of this case, the Court of Appeals for the

Ninth Circuit, by its opinion filed May 22, 1963, reversed the decision of the Tax Court, holding that the transaction was an exchange within the purview of Section 1031(a).

The facts are quite analogous to those of the instant case. The Aldersons (hereinafter referred to as "taxpayers") entered into an agreement on May 21, 1957 with Alloy Die Casting Company (hereinafter referred to as "Alloy") to sell their Buena Park farm property in Orange County, California, to Alloy for $172,871.40, and according to the terms of the agreement Alloy deposited with Orange County Title Company, $17,205.00 toward the purchase of the property. From the outset, the taxpayers' desire was to exchange their Buena Park property for other property of a like kind. They intended to sell the property for cash only after they were unable to locate a suitable piece of property to take in exchange. Alloy intended simply to effect a purchase of the property for cash. Alloy did not learn that petitioners wished to exchange their property for like property until the latter part of July, 1957. Sometime after the execution of the purchase and sale agreement, taxpayers located certain property in Monterey County, referred to as the Salinas property, which they desired to obtain in exchange for the Buena Park property. On August 19, 1957, taxpayers and Alloy executed an amendment to their previous agreement providing that the Salinas property would be acquired by Alloy and exchanged for the Buena Park property in lieu of the originally contemplated cash sale transaction. However, the amendment provided that, if this exchange were not effected by September 11, 1957, the original agreement with respect to a purchase for cash would be carried out. On that same day, the daughter and agent of taxpayers delivered to the Salinas Title Guarantee Company, "Buyers' Instructions" reciting that $190,000.00 would be paid for the Salinas property, that $19,000.00 was paid therewith out of taxpayers' money on deposit with the title company, and authorizing the title company to convey the Salinas property to Alloy provided a deed from Alloy to taxpayers could be immediately recorded. The Salinas title company acquired title to the Salinas property for a purchase price of $190,000.00, the funds being provided by the $19,000.00 deposited by taxpayers' daughter, and $172,871.40 being paid to the title company by Alloy, the excess of the amounts deposited being returned to taxpayers. The title company then conveyed the Salinas property to Alloy, who in turn conveyed it by deed to taxpayers, and at the same time the taxpayers conveyed the Buena Park property to Alloy. Taxpayers paid for all documentary stamps on the deeds and all escrow fees.

Upon these facts, the Tax Court held that the transaction was a sale by taxpayers of their Buena Park property to Alloy for cash, and a reinvestment by taxpayers of the purchase price in the Salinas property, Alloy only acting as a conduit through which title to the Salinas property passed.

In reversing the decision of the Tax Court, the Court of Appeals seemed impressed by the fact that, from the outset, it was taxpayers' desire to effect an exchange of property. The Court said:

> "Petitioners, on finding the Salinas property, took steps to make it available to Alloy for the exchange by signing buyer's instructions in the escrow of August 19, 1957, opened at Salinas Title, but the fact is, as found by the Tax Court, that petitioners at that time intended to accomplish an exchange of properties and that the Salinas property was 'acquired by Alloy' for the sole purpose of such exchange.

> "True, the intermediate acts of the parties could have hewn closer to and have more precisely depicted the ultimate desired result, but what actually occurred on September 3 or 4, 1957, was an exchange of deeds between petitioners and Alloy which effected an exchange of the Buena Park property for the Salinas prop-

erty. It is also noted by the court that the buyer's instructions in the Salinas escrow did not conform to the seller's instructions although the transfer from the original owner of the Salinas property to Salinas Title was, as to the provisions at variance, pursuant to the terms of the buyer's instructions. If Alloy had signed the said 'Buyer's Instructions' this litigation would have been avoided, but even in the circumstances here involved the court concludes that the intended exchange was accomplished.

\* \* \* \* \* \*

"In the case at bar, the ultimate objective appears without question to have been the exchange of property of like kind. As the court in the Helvering case [Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596] further observes:

" 'Putting aside, then, the question of motive in respect of taxation altogether, and fixing the character of the proceeding by what actually occurred, what do we find?' (293 U.S. page 469, 55 S.Ct. page 267).

"In the instant case we find a plan to exchange the properties within the intent of the statute (§ 1031 I.R.C. of 1954), and the acquiring of the Salinas property by Alloy with the sole purpose of trading same for the Buena Park property which does not make the transaction one within Section 1002, Internal Revenue Code of 1954."

In the instant case, we are of opinion that there was ample evidence to support the conclusion of the District Court that the transaction between Coastal and Delhi-Taylor was an "exchange" within the purview of Sec. 1031(a) and not a "sale" as contemplated by Sec. 1002.

Nor can we agree with the Government's alternate contention that gain to Coastal was recognizable under Sec. 1031 (b) and (d) under the theory that Delhi-Taylor's payments to Chicago Bridge and Kaminer for the construction of terminal facilities were payments by Delhi-Taylor of obligations of Coastal. Before any work was done, and in fact, before any binding legal obligations had been incurred by Coastal to either Chicago Bridge or Kaminer, Delhi-Taylor undertook to have these terminals constructed by Chicago Bridge and Kaminer in order to be in position to make the exchange with Coastal. So Delhi-Taylor paid its own legally incurred obligations and not the obligations of Coastal.

It follows that the judgment of the District Court is hereby

Affirmed.