Francis J. BARKER, II and Jerilyn
Barker, Plaintiffs,

v.

UNITED STATES of America,
Defendant.

No. 86–1129.

United States District Court,
C.D. Illinois.

June 29, 1987.

William J. Brinkmann, Thomas, Mamer &
Haughey, Champaign, Ill., for plaintiffs.

K. Tate Chambers, Asst. U.S. Atty., Peo-
ria, Ill., and Jeffrey N. Kaplan, Trial Atty.,
Tax Div., U.S. Dept. of Justice, Washing-
ton, D.C., for defendant.

## ORDER

MIHM, District Judge.

Presently before this Court is the Plain-
tiffs', Francis J. Barker, II and Jerilyn
Barker (hereafter the Barkers), Motion for
Summary Judgment and the Defendant's,
the United States of America, Motion for
Summary Judgment. Both Motions for
Summary Judgment present the same
three issues: (1) whether the Barkers are
entitled to an investment tax credit on the
farm improvements received in 1977 in the
"exchange" with Charles S. Keeling; (2)
whether the Barkers are entitled to depre-
ciate the farm improvements for the entire
year of 1977 or only from September 15,
1977; (3) whether the Barkers are entitled
to use $127,500 or $117,500 as the tax basis
for depreciation of the farm improvements.

In November of 1976, Francis J. Barker,
II entered into an agreement with Charles
Keeling, who owned a certain 50 acre par-

cel of farmland located in Champaign County (hereafter farmland). The agreement was that Barker would acquire a parcel of property suitable to Keeling and exchange that parcel for the 50 acres of land which Keeling owned. The reason that the transaction was set forth as an exchange and not a sale was that Mr. Keeling informed Barker during the negotiations that the only way he would dispose of the property was through a tax deferred exchange.

Keeling allowed Barker to farm the property and use the improvements during 1976 and 1977, while Barker was in the process of finding a suitable parcel land for the exchange. In January of 1977, Barker performed full tillage on the farmland and moved his farm machinery and livestock into the barns and sheds located on the farmland. He planted crops in the spring, tended to them during the summer, and harvested them in the fall of 1977. In the early part of that year, Barker repaired certain damage to the buildings on the farmland caused by a tornado. He performed general maintenance duties and paid no rent to Keeling. However, Keeling paid both the mortgage and insurance premiums on the land.

In July of 1977, Barker found a suitable piece of property for Keeling, in Kankakee, Illinois (hereafter Kankakee property). Barker purchased the Kankakee property for $265,000 in September of 1977. Also in September of 1977, a written contract was prepared for the exchange between Keeling and Barker of the Kankakee property for the farmland property.

The closing for both the sale of the Kankakee property and for the exchange of the Kankakee property for the farmland took place on September 15, 1977. Barker paid $265,000 for the Kankakee property, $187,-500 of which was paid from the proceeds of a bank loan and the remaining $77,500 he received from Keeling as part of the exchange.

An addendum to the contract was entered into between Barker and Keeling, which stated that the parties had agreed that a reasonable valuation for the improvements upon the Champaign farmland was $127,500. The Plaintiffs allege that this addendum was entered into in July of 1977, at the same time that the exchange agreement was executed. Then, in 1979, the Barkers hired Dunn and Associates of Champaign, Illinois to appraise the property and to determine the value of the improvements as of September 1, 1977. The Dunn and Associates report represented the value of the improvements as $117,500.

Sometime after September of 1977, the Internal Revenue Service audited the tax return of the Barkers. The Internal Revenue Service made three adjustments to the joint tax return of the Barkers for 1977. All of the adjustments pertained to the improvements to the farmland received by the Barkers in their exchange with Keeling.

First, the Barkers had claimed an investment tax credit of $7,050 for the improvements to the farmland he received in the exchange with Mr. Keeling. The Internal Revenue Service disallowed the investment credit stating that the Barkers could not receive an investment credit for property he received in a tax free exchange. Second, the Barkers took a deduction in 1977 for a full year of depreciation on the improvements, even though the exchange was not consummated until September 15, 1977. The Internal Revenue Service limited the depreciation deduction for 1977 to the portion of the year after the exchange took place. Third, the Barkers used as a basis for depreciation of the improvements $127,-500, which was taken from the addendum of the contract. The Internal Revenue Service limited the basis for depreciation of the improvements to $117,500, which is the amount determined by Dunn and Associates, the Barkers' appraiser.

The Internal Revenue Service cited the Barkers for a tax deficiency of $11,321.82. On March 3, 1982 the Barkers paid the tax and filed a claim for refund with the Internal Revenue Service. On November 1, 1983, the claim for refund was denied. On November 1, 1985, this suit was filed.

*Investment Credit*

The first issue before this Court, as already noted, is whether the Barkers are entitled to an investment tax credit on the farm improvements received in 1977 in the "exchange" with Charles Keeling. The resolution of this issue begins with a look at § 1031(a)(1) of the Tax Code. 26 U.S.C. § 1031(a)(1) (1986). In order to qualify for non-recognition of gain or loss from exchanges solely in kind, or in other words to qualify for tax deferral, the property exchanged by the owner must be held for "productive use in trade or business or for investment." 26 U.S.C. § 1031(a)(1). Further, this property must be exchanged solely for property of like kind, which is also held either for "productive use in a trade or business or for investment purposes." 26 U.S.C. § 1031(a)(1).

The relevance of turning to § 1031(a)(1) first in the analysis is that a determination of non-recognition of gain or loss is critical to the computation of the investment credit allowed. Where the exchange of used § 38 property qualifies under § 1031, the taxpayer's "cost" of the property received, for purposes of tax investment credit, will be reduced by the basis of the property given up in the exchange. Thus, if the basis in the property given up is equal to the basis in the property acquired, the taxpayer's investment credit "cost" in the property will be 0. The taxpayer will be entitled to an investment credit in the amount of 0 times the applicable § 46 percentage. However, where it is determined that the property does not qualify for non-recognition under § 1031, the taxpayer will be entitled to an investment credit in the amount of the applicable § 46 percentage times his or her cost in that property without any reduction. In the present case, it is the nature of this exchange that is the fundamental issue to be resolved.

The second step of this Court's analysis involves a look to § 38 of the Tax Code. 26 U.S.C. § 38. Section 38 provides that "There shall be allowed, as a credit against the tax imposed by this chapter, for the taxable year an amount equal to the sum of ... (2) the amount of the current year

business credit,...." The amount of the current year business credit is the sum of the following credits determined for the taxable year: "(1) the investment credit determined under § 46(A), ..." 26 U.S.C. § 38(b)(1).

Section 46(a) sets forth that for the purpose of § 38, "the amount of the investment credit determined under this section for any taxable year shall be an amount equal to the sum of the following percentages of the qualified investment (as determined under subsections (c) and (d)) ..." 26 U.S.C. § 46(a). Section 46(c), "qualified investment," provides "that for the purpose of this subpart, the term 'qualified investment' means, with respect to any taxable year, the aggregate of ... (B) the applicable percentage of the cost of each used section 38 property (as defined in § 48(c)(1)) placed in service by the taxpayer during such taxable year." 26 U.S.C. § 46(c)(1)(B). Section 48(c)(3)(B) provides:

"The cost of used section 38 property does not include so much of the basis of such property as is determined by reference to the adjusted basis of other property held at any time by the person acquiring such property." 26 U.S.C. § 48(c)(3)(B).

Section 46(c)(2) sets forth the applicable percentages in certain cases. Although the 1986 Tax Code uses different percentages, the Defendant sets forth that in 1977 the applicable percentage would have been 10%. The Barkers concur on this point. Further, there is no dispute as to the fact that the property in question falls under the Tax Code "used property" provisions.

In sum, this analysis brings us back to the proposition that, if the exchange between the Barkers and Keeling constituted a "tax free" exchange under § 1031, the cost of the used § 38 property to the Barkers must be deemed to exclude the value of the basis of the farmland exchanged with Keeling. Thus, the Barkers' cost in the property would be 0, and they would be entitled to a tax investment credit of 10% times 0.

■ The Barkers assert that the exchange of the Kankakee property for the

farmland was not a "like-kind" exchange under § 1031. In support of this argument, they point to the fact that it cannot be said that the Kankakee property was purchased "for productive use in trade or business or for investment." For the Barkers are farmers, and never used the Kankakee property, a restaurant, in their trade or business. Further, when the Barkers purchased the Kankakee property, they simultaneously used it in exchange for the farmland with Keeling. Thus, the property was not held for investment purposes. The Barkers' argument has a firm foundation, particularly in light of the fact that property for investment purposes usually involves a profit of some sort to the taxpayer. In the present case, the taxpayer incurred no profit by the purchase of the Kankakee property.

On the other hand, the Defendant turns the Court's attention to the fact that the transaction between the Barkers and Keeling was specifically and intentionally structured to be of a tax free nature. The Defendant cites to Keeling's deposition in which he stated that a tax free exchange "was the only way I was going to sell it." (See Keeling deposition, p. 12, lines 1–3). By having an exchange and not a purchase of the farmland, Keeling was allowed to defer taxation on a $100,000 gain, and was therefore, willing to go through with the transaction.

The Defendant asserts that the transaction between the Barkers and Keeling must properly be characterized as a three corner exchange, which has been repeatedly held to be tax free under § 1031. See, e.g., *Starker v. United States*, 602 F.2d 1341, 1352–53 (9th Cir.1979); *Alderson v. Commissioner of Internal Revenue*, 317 F.2d 790 (9th Cir.1963); *Coastal Terminals, Inc. v. United States*, 320 F.2d 333 (4th Cir.1963); *Woodbury v. Commissioner of Internal Revenue*, 49 T.C. 180 (1967). More recently, the three corner exchange of property question was addressed by the Ninth Circuit in *Bolker v. Commissioner of Internal Revenue*, 760 F.2d 1039 (9th Cir.1985).

The Defendant states that the court in *Bolker* held:

"If a taxpayer owns property which he does not intend to liquidate or to use for personal pursuits, he is 'holding' that property 'for productive use in trade or business or for investment' within the meaning of section 1031(A)."

Further, the Defendant asserts that the *Bolker* court concluded that since the taxpayer purchased the property with the intent to exchange it in a like kind exchange, it was held for "productive use in trade or business or for investment," because it was not intended that the property be used for personal pursuits.

The Barkers take issue with the Defendant's reading of the opinion in *Bolker*. The Barkers assert that the Ninth Circuit expressly distinguished the facts of their case from the situation in the present case. The Barkers distinguish the holding of *Bolker* on the basis of the Court's reference to Rev.Rul. 77–297, and the fact that Bolker planned to acquire the property before he had any intention of exchanging it, and Bolker actually held the property for three months before he exchanged it. *Id.* This Court concurs with the Barkers' assertions that the holding in *Bolker* is distinguishable from the case before this Court on the facts, and the distinction is one that the *Bolker* court itself made note of. *Bolker v. Commissioner of Internal Revenue*, 760 F.2d at 1043.

The facts in the present case are very similar to those set forth in Rev.Rul. 77–297, to which the *Bolker* court refers. Rev.Rul. 77–297 provides:

"In Rev.Rul. 77–297, B wanted to buy A's ranch, but A wanted to exchange rather than sell. A located a desirable ranch owned by C. Pursuant to a prearranged plan, B purchased C's ranch and immediately exchanged it with A for A's ranch. As to A, the exchange qualifies under section 1031(A). As to B, it does not since B never held C's ranch, and acquired it solely to exchange." *Bolker v. Commissioner of Internal Revenue*, 760 F.2d 1039, 1042 (9th Cir.1985).

A reading of this ruling seems to recognize that there may exist situations where the transaction will satisfy § 1031 for one party, and not for the other. Nonetheless, each transaction must be evaluated separately in light of the "productive in trade or business or investment" requisite of the statute.

It is not disputed that the Keeling farmland was acquired and held "for the productive use in trade or business." However, this Court reads § 1031(a) to require that both transactions, the acquisition of the Kankakee property and the acquisition of the Keeling farmland, be "for productive use in trade or business or for investment" to qualify under § 1031. Therefore, this Court must examine whether the acquisition of the Kankakee property also satisfies § 1031.

It would appear that the Barkers acquired the Kankakee property, a restaurant, solely for the purpose of exchanging it for Keeling's farmland. It is difficult to conclude that the acquisition of this property was in any way for the productive use in the Barkers' trade or business, i.e., farming, or held for investment. The Barkers are farmers. It appears that they would have no use for a restaurant in furtherance of their business. Further, the Barkers only "owned" the restaurant for perhaps several minutes, for the sale was closed at the same time that the exchange was made with Keeling. Certainly, such ownership does not connote an intention to acquire for investment purposes.

The Court will concede that it does not have a "label" for the Barkers purpose in acquiring the Kankakee property. However, it does hold that whatever the purpose might have been, it was neither "productive use in trade or business *or* investment." It would appear that the acquisition of the Kankakee property was for the purpose of immediate disposal of the property, and in a sense, to use it as a medium of exchange to acquire the Keeling farm. Therefore, since the Kankakee property acquisition does not satisfy the requisites of § 1031, the Barker transaction is held to not be a tax-free exchange, pursuant to 26 U.S.C. § 1031.

## Depreciation on Farm Improvements

■ The second issue before the Court is whether the Barkers are entitled to depreciate the farm improvements for the entire year of 1977 or from September 15, 1977. During 1977, Section 167 of the Tax Code allowed a deduction for the depreciation of property used in trade or business or for the production of income. The amount of the depreciation deduction depended on the tax basis of the property. Section 167(g) states that the adjusted basis for depreciation is the same as the adjusted basis under § 1011. Sections 1011, 1012, and 1016 provide that the basis for depreciation is generally its cost. Thus, the question becomes whether the Barkers had basis in the farmland in January of 1987, when they took possession, for the purpose of depreciating the property.

The Barkers took possession of the farm in January of 1977, used the barns to store machinery and livestock, and the grain bins to store feed for the livestock. The Barkers used all of the buildings, grainery bins and improvements on the land continuously from January 1977 to the present. The Barkers argue that according to Treasury Regulation § 1.167(A)–10(B), "The period for depreciation of an asset shall begin when the asset is placed in service and shall end when the asset is retired from service." Treasury Regulation § 1.167(A)–10(B) (1960). As such, the Barkers assert that they placed the improvements on the Keeling farm "into service" in January of 1977 and are, therefore, entitled to depreciation for the full year of 1977.

It appears to the Court that the Defendant's argument is on much firmer ground than that of the Barkers. First, the Defendant contends that one cannot depreciate something in which he or she has no basis. The Defendant asserts that the Barkers had no basis in the property until the exchange was completed in September of 1977, and therefore, were not entitled to depreciate the property until that time. Second, Keeling, not the Barkers, bore the benefits and burdens of ownership, until

the time of the exchange in September of 1977.

The Court agrees with the Defendant's contention that one cannot depreciate something in which he or she has no basis. Further, the Court concludes that the Barkers had no basis in the farmland until September of 1977. Section 167 of the Code sets forth that one's basis in property, for the purpose of depreciation, is its cost. Cost in property cannot be acquired until something is given up, whether that had been money, land or even a contractual commitment to pay, i.e., deferred payment plan or credit purchase. The Barkers gave up nothing until September of 1977.

It is not disputed that the Barkers and Keeling entered into an agreement to exchange properties in the fall of 1976. However, Keeling's performance was contingent upon the Barkers finding a suitable piece of property. Thus, the exchange was not complete until September of 1977 when each party performed. This Court finds it impossible to conclude that under this factual situation, the Barkers had any basis or cost in the property until the time of the exchange in September of 1977. Rather, the record establishes that the Barkers had no legally recognized interest in the farmland, except a revocable license for possession.

As to the Defendant's second contention, the Court must also agree that Keeling, not the Barkers, bore the benefits and burdens of ownership. The threshold question in situations where the possession of the property is in the hands of a taxpayer, other than the person who has title, is who "bear(s) the burden of exhaustion of the capital investment." See *Helvering v. Lazarus*, 308 U.S. 252, 254, 60 S.Ct. 209, 210, 84 L.Ed. 226 (1939). The answer to this question requires an evaluation of who bears the benefits and burdens of ownership. See *Blake v. Commissioner of Internal Revenue*, 2 T.C. 721 (1953).

Both parties cite to Rev.Rul. 69–89. However, the Barkers' reliance on Rev.Rul. 69–89 is somewhat misplaced. They cite that Revenue Ruling for the proposition that a purchaser of real property is entitled to allowable depreciation on the depreciable portion of the property, commencing when he takes possession of the property and assumes the burden and benefits of ownership pursuant to an agreement entered into to acquire title. Further, the purchaser need not obtain title to the property nor pay in full before he may start the depreciation on the property. As pointed out by the Defendant, while the Barkers' restatement of the Revenue Ruling is correct, it is misplaced in that the facts under Rev.Rul. 69–89 involved a determination that an agreement which provided for deferred payments constituted a sale at the time that the buyer took possession of the property.

In Rev.Rul. 69–89, an installment sale took place where property was sold, but payments were deferred to a later date. The title did not technically pass. However, it was determined that a sale had taken place since the burdens and benefits were transferred. The Revenue Ruling concluded that the vendee was entitled to begin depreciating the property.

Revenue Ruling 69–89 is primarily distinguishable from the present case because it was determined that a sale occurred at the time the vendee took possession of the property. In this case, it is not disputed that the exchange did not occur until September, 1977.

Revenue Ruling 69–89 also addresses the question of who bore the benefits and burdens of ownership. A review of the record in this case leads the Court to conclude that Keeling bore both the benefits and burdens. Keeling paid both the mortgage and the insurance on the property up until the time of the exchange. Keeling had the right to sell the property at any time. The Court finds that these acts tilt the scale in favor of the conclusion that Keeling, not the Barkers, bore the benefits and burdens of ownership.

The Court does not overlook the fact that as of January 1977, the Barkers used the barns to store their machinery and livestock and the grain bins to store feed for the livestock. Further, it is not overlooked that the Barkers used water from the well,

worked the fields, and repaired damage to the farm caused by a tornado, although there is a dispute concerning whether or not the Barkers were reimbursed for that expenditure. However, a review of these facts leads the Court to the conclusion that these activities engaged in by the Barkers were incidents of the right to possession, not "ownership," as the Tax Code requires for depreciation purposes. Therefore, the Court finds that the Barkers were entitled to depreciate the farmland only after the exchange was consummated in September of 1977.

In conclusion, the Court finds that the Barkers had no basis in the farmland until September of 1977. Further, it finds that Keeling, not the Barkers, bore the benefits and burdens of ownership for the farmland until the consummation of the exchange in September of 1977.

*Tax Basis for Depreciation of Farm Improvements*

■ The third issue before this Court is whether the Barkers are entitled to use $127,500 or $117,500 as a tax basis for the depreciation of the farm improvements. Prior to September of 1977, the Barkers entered into an addendum to the contract with Keeling. This addendum valued the improvements on the farmland. The aggregate value assigned to those improvements was $127,500.

In April of 1979, presumably in response to the Internal Revenue Service's inquiry, the Barkers hired Dunn & Associates to appraise the farmland. The Dunn report valued the improvements at $117,500. The dispute arose as to whether the Barkers were entitled to use the contract addendum value of $127,500 as a tax basis for the depreciation of the farm improvements. The Defendant contends that they may not, and that the Barkers may properly be held to the value of $117,500 assigned to these improvements in the Dunn report.

In the Defendant's Motion for Summary Judgment, it argues that the Internal Revenue Service is not bound by the value assigned to the improvements in the contract addendum. Rather, the Internal Revenue Service may require that the taxpayer use the more objective valuation, which in this case is the value assigned to the improvements by the independent appraiser. Thus, the Defendant asserts that when determining tax liability, the Internal Revenue Service may look through the form of a transaction to its substance. *C. Bradley v. United States*, 730 F.2d 718, 720 (11th Cir. 1984).

In contrast, the Barkers contend that where the value of improvements are established through arms-length negotiations, such evaluation cannot be revised without strong proof that the negotiations were not conducted at arms length. *Estate of Rogers v. Commissioner*, 445 F.2d 1020 (1971), aff'd in T.C. Memo 1970–192. In essence, the Barkers concede that the value of the improvements to which they agreed in the addendum of the contract may not be in fact the "actual value." However, the Barkers assert that the fact that the taxpayer may have made a bad bargain by purchasing the property at a price above fair market value will not prevent the taxpayer from using actual cost as its basis for tax purposes. *Commissioner of Internal Revenue v. Matheson*, 31 BTA 493, aff'd 82 F.2d 380 (5th Cir.1936).

The Court agrees with the Barkers' position that where a value to improvements on land is assigned through arms-length negotiations, that value must be accepted by the Internal Revenue Service when determining tax liability. However, the Court does not agree that the present case involves such arms-length negotiations, as to the assignment of values set forth in the addendum. Therefore, the Court finds that the Internal Revenue Service properly turned to the $117,500 value in the Dunn report.

The concept of arms-length negotiation assumes that the parties to the negotiations both have things to gain and lose by the final structure of the transaction. Thus, the negotiations would be, in a sense, adversarial, and the result equitable to all parties. For each party would win some of its points and lose others.

The problem in the present case is that this win/lose situation was not present.

The record reflects that the total "price" of the farmland was determined and agreed to by the parties in November of 1976. For whatever reason, the valuation of the improvements was *not* agreed to until July of 1977. There is no evidence in the record that could lead this Court to the conclusion that the result of the parties' improvements valuation process would have changed the total purchase "price." Rather, the record leads this Court to conclude that the total "price" was firm, and the valuation process was only an allocation of that price to various improvements. Thus, no adversarial situation existed. In fact, as the Defendant points out, both parties would gain by a high valuation of the improvements. In an arms-length situation such a fact would not be significant, in a non-arms-length situation, it certainly is significant.

In light of the Court's finding that the valuation of the improvements does not constitute arms-length negotiations, the Court concludes that it was proper for the Internal Revenue Service to look to the Dunn report for the "actual" value of the improvements. Therefore, the Court finds that the Barkers are entitled to use $117,500 as their tax basis for the depreciation of the farm improvements.

In sum, the Court finds that:

1. The Barker-Keeling exchange was not a like-kind exchange, and, therefore, is not governed by 26 U.S.C. § 1031.

2. The Barkers are entitled to depreciate the farmland as of September 1977.

3. The Barkers are entitled to use $117,500 as their tax basis for the depreciation of the farm improvements.

It is ordered:

1. As to the § 1031 like-kind exchange issue, the Barkers' Motion for Summary Judgment is GRANTED and the Defendant's Motion for Summary Judgment is DENIED.

2. As to the depreciation issue, the Defendant's Motion for Summary Judgment is GRANTED and the Barker's Motion for Summary Judgment is DENIED.

3. As to the tax basis for depreciation of the farm improvements issue, the Defendant's Motion for Summary Judgment is GRANTED and the Barkers' Motion for Summary Judgment is DENIED.

It is further ordered that the Barkers are entitled to a judgment of $7,050, representing the tax investment credit due them on the Barker-Keeling transaction.