111 T.C. No. 10


UNITED STATES TAX COURT


U.S. BANCORP AND ITS CONSOLIDATED SUBSIDIARIES,
Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 27342-96.[1]                    Filed September 21, 1998.


P, a bank holding company, leased a mainframe computer from ICC, a finance corporation, for a 5-year term.  Less than 1 year later, P decided that the computer was no longer adequate for its needs.  P thereupon entered into a "rollover agreement" with ICC, whereby the lease was terminated upon the condition, among other things, that P commit to finance the

_____

[1] On Nov. 18, 1997, the Court granted petitioner's motion to consolidate this case for trial, briefing, and opinion with the case at docket No. 6544-97.  The issue herein is not related to the issues in docket No. 6544-97 and does not involve the tax years at issue in docket No. 6544-97.  Therefore, the Court, by order dated Sept. 15, 1998, denied petitioner's motion for partial summary judgment and respondent's cross-motion for partial summary judgment on the IBM lease issue in the case at docket No. 6544-97.  The order pursuant to this opinion will be issued only in docket No. 27342-96.

replacement equipment with ICC.  The rollover agreement
provided for a $2.5 million rollover charge to be paid
by P.  Shortly thereafter, pursuant to the rollover
agreement, P leased a more powerful mainframe computer
from ICC for a 5-year term.  ICC financed P's
obligation to pay the $2.5 million rollover charge over
the 5-year term of the second lease.

Held:  The $2.5 million rollover charge P incurred
is not currently deductible in the year of termination
of the first lease but must be capitalized and
amortized over the 5-year term of the second lease.

Richard A. Edwards and David W. Brown, for petitioner.

William P. Boulet, Jr. and Virginia L. Hamilton, for

respondent.

OPINION

BEGHE, Judge:  This matter is before the Court on the

parties' motions for partial summary judgment filed under Rule

121.[2]  Petitioner's principal office was located in Portland,

Oregon, when it filed the petition.

The sole issue for decision is whether the charge incurred

by a lessee in terminating a lease of a mainframe computer and

simultaneously initiating a new lease of a more powerful

mainframe computer with the same lessor is deductible in the year

incurred or must be capitalized and amortized over the 5-year

---

[2] All Rule references are to the Tax Court Rules of Practice
and Procedure.  All section references are to the Internal
Revenue Code in effect for the years at issue.

term of the new lease. We hold that the charge must be capitalized and amortized over the term of the new lease.

The background facts set forth below are derived from the pleadings in this case, petitioner's request for admissions, respondent's responses to petitioner's request, affidavits and exhibits attached to petitioner's motion for partial summary judgment, respondent's cross-motion for partial summary judgment, the declaration and exhibits attached to respondent's response to petitioner's motion, the exhibits attached to petitioner's reply to respondent's response, and the exhibits and affidavits attached to petitioner's first and second supplemental replies to respondent's response. The background facts do not appear to be in dispute and are set forth solely for purposes of deciding the motions and are not findings of fact for this case. Fed. R. Civ. P. 52(a); Sundstrand Corp. v. Commissioner, 98 T.C. 518, 520 (1992), affd. 17 F.3d 965 (7th Cir. 1994).

Background

Petitioner is a successor in interest by merger of West One Bancorp. Moore Financial Group, Inc. (Moore Financial), was a national bank holding company incorporated in the State of Idaho in 1981. In 1989, Moore Financial changed its name to West One Bancorp (West One). In 1995, West One merged into U.S. Bancorp (Old Bancorp), a bank holding company incorporated in the State of Oregon. In 1997, Old Bancorp merged into First Bank System,

Inc., a bank holding company incorporated in the State of Delaware, which then changed its name to U.S. Bancorp (petitioner). West One was a calendar year taxpayer that used the accrual method of accounting for 1989 and 1990, the tax years in issue.

The leases at issue in this case were between West One as lessee and IBM Credit Corp. (ICC) as lessor. For purposes of leasing computer equipment, ICC uses a document captioned "Term Lease Master Agreement" (the Master Agreement), which contains an umbrella set of terms. Customers of ICC sign the Master Agreement, whose terms then govern all future lease transactions between ICC and the customer. When a customer enters into an individual lease transaction, it signs a document captioned "Term Lease Supplement" (Supplement), which expressly incorporates the terms of the Master Agreement and contains a description of the leased equipment, price terms, financing arrangements, and other factors unique to the transaction. The Master Agreement explicitly provides that the lease cannot be canceled and does not provide for a specific charge in case of early termination of the lease or for a formula for computing any such charge.

West One, at the time still named Moore Financial, executed the Master Agreement with ICC in March 1989. In August 1989, West One leased an IBM 3090 mainframe computer (the 3090) from ICC (the First Lease). The lease term commenced August 30, 1989,

and was to end on June 28, 1994, and called for monthly payments of $128,701. The Supplement for the First Lease has not been provided to the Court.

During 1990, West One determined that the 3090 was no longer adequate for its needs and that an upgrade to a more powerful mainframe computer would be required. Accordingly, in October 1990, West One and ICC executed a document captioned the "Rollover Agreement" (the Agreement). Under the Agreement, ICC released West One from its obligations under the First Lease on several conditions, including that West One finance its replacement computer equipment with ICC ("Lessee commits to finance the replacement Equipment with IBM Credit Corporation"). Under the Agreement, the termination of the First Lease took effect on November 15, 1990, at which time the payments yet to be made under the First Lease in accordance with its terms would have amounted to approximately $5,662,844. However, the Agreement required West One to pay a "Rollover Charge" of $2.5 million, which was financed by ICC over the 5-year period of the new lease (discussed in the next paragraph). The Agreement concludes with the following statement:

> This Agreement is valid when accepted by both parties and payment in full (Rollover charge plus all lease payments due through the Rollover Date) or a signed Term Lease Supplement financing the Rollover charge is received by Lessor on or before November 15, 1990. This supercedes [sic] any prior Rollover quote for this equipment.

On October 31, 1990, West One executed a lease with ICC for an IBM 580 mainframe computer (the 580) for a 5-year term (the Second Lease). Under the Second Lease, West One was required to make 60 monthly payments, each in the total amount of $182,484, consisting of $128,709 for the Second Lease and $53,775 for the rollover charge. The form of Supplement used by ICC refers, as does the Supplement for the Second Lease, to the charge for canceling an old lease as a rollover charge that is to be billed monthly along with the lease payments under the Second Lease.

Under the description of the equipment to be leased, the Supplement for the Second Lease provides: "Option S financing for ICC lease termination of the 3090/74299 complex is contingent upon ICC financing of the 9021/580. If the 9021/580 is not financed via ICC, the ICC lease termination charges for the 3090 complex will be due under quote #E320999A" (the document containing this alternative quote has not been located). Although ICC does not have a fixed formula for calculating a termination charge and takes a number of factors into account in determining its negotiating position with the terminating lessee, the termination charge is generally less if the lessee agrees to obtain financing from ICC for replacement equipment.[3]

---

[3] The consistent terminology of the Agreement and the Supplement lead us to conclude that the references therein to financing the replacement equipment include entry into a lease therefor.

Although the Supplement does not expressly so state, it implies, consistently with the concluding paragraph of the Rollover Agreement, that if the replacement equipment had not been financed through ICC, whatever termination charge the parties had agreed upon would have been immediately due and payable.

On its 1990 Federal consolidated income tax return, petitioner claimed a deduction of $793,753 as an expense of terminating the First Lease. In the statutory notice of deficiency issued to petitioner on September 20, 1996, respondent disallowed the deduction and increased petitioner's income for the 1990 taxable year by $793,753. The explanation of adjustments section of the notice stated that the termination charge was a capital expenditure under section 263 because petitioner entered into a lease with ICC for replacement equipment, and that, because no payments under the new lease were made until 1991, no amortization deduction would be allowed for 1990.

In the petition filed December 24, 1996, petitioner alleged that respondent erred in determining that the termination charge was a capital expenditure and not an ordinary and necessary business expense within the meaning of section 162. On December 15, 1997, petitioner amended its petition, alleging that the full $2.5 million charge for termination of the First Lease

was deductible as an expense in 1990. Petitioner explained that the $793,753 deducted on the 1990 return was the amount of the lease termination charge recorded on its books for financial statement purposes, using capital lease accounting rules, but that for Federal tax purposes petitioner was taking the position that it was entitled to deduct the full termination charge of $2.5 million for the taxable year in which it became legally obligated to pay that amount.

A supplement to respondent's response to petitioner's motion for partial summary judgment partially alters respondent's position. Respondent now concedes that petitioner is entitled "to an amortization deduction for one month in 1990, or to one-sixtieth of the total $2.5 million rollover payment" because petitioner is an accrual basis taxpayer, and because the obligation to make the first monthly payment for the rollover charge accrued on December 1, 1990.

Discussion

Summary judgment is intended to expedite litigation and avoid unnecessary and expensive trials. Florida Peach Corp. v. Commissioner, 90 T.C. 678, 681 (1988). Summary judgment is appropriate where there is no genuine issue of material fact and decision may be rendered as a matter of law. Rule 121(b); Sundstrand Corp. v. Commissioner, 98 T.C. at 520; Jacklin v. Commissioner, 79 T.C. 340, 344 (1982). In deciding whether to

grant summary judgment, the factual materials and inferences drawn from them must be considered in the light most favorable to the nonmoving party.  Bond v. Commissioner, 100 T.C. 32, 36 (1993); Naftel v. Commissioner, 85 T.C. 527, 529 (1985).  If the conditions for summary judgment are otherwise satisfied with respect to a single issue or fewer than all the issues in a case, then partial summary judgment may be granted, notwithstanding that all the issues in the case are not disposed of.  Rule 121(b); Naftel v. Commissioner, supra.

The parties agree, and we concur, that no issues of material fact are in dispute.  Consequently, we may render judgment on the issue in this case as a matter of law.  Rule 121(b).  The issue for decision is whether the obligation incurred by petitioner to pay the rollover charge to ICC is deductible as an ordinary and necessary business expense under section 162, or whether it must be capitalized under section 263 and amortized over the term of the Second Lease.

Whether an expenditure may be deducted or must be capitalized ultimately depends on the facts and circumstances of each case.  Deputy v. Du Pont, 308 U.S. 488, 496 (1940). An expenditure incurred in a taxpayer's business may qualify as ordinary and necessary under section 162 if it is appropriate and helpful in carrying on that business, is commonly and frequently incurred in the type of business conducted by the taxpayer, and

is not a capital expenditure under section 263. Commissioner v. Tellier, 383 U.S. 687, 689 (1966); Deputy v. Du Pont, supra at 495; Welch v. Helvering, 290 U.S. 111, 113 (1933). If a cost is a capital expenditure, the capitalization rules of section 263 take precedence over the deduction rules of section 162, sec. 161; Commissioner v. Idaho Power Co., 418 U.S. 1, 17 (1974), thereby preventing capital expenditures from being deducted currently under section 162.

In determining whether a cost is a capital expenditure, the Supreme Court in INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992), noted that deductions are exceptions to the norm of capitalization. The Court stated that deductions are specifically enumerated and thus are subject to disallowance in favor of capitalization. Capital expenditures, by contrast, are not exhaustively enumerated; rather than providing a complete list of nondeductible expenditures, section 263 serves as a general means of distinguishing capital expenditures from current expenses.

The creation of a separate and distinct asset, while sufficient to classify an expenditure as capital in nature, Commissioner v. Lincoln Sav. & Loan Association, 403 U.S. 345, 354 (1971), is not necessary to capital classification. The Supreme Court stated in INDOPCO that a taxpayer's realization of benefits beyond the year in which the expenditure is incurred is

important in determining whether the appropriate tax treatment is a current deduction or a capital expenditure. INDOPCO, Inc. v. Commissioner, supra at 87-88 (quoting United States v. Mississippi Chem. Corp., 405 U.S. 298, 310 (1972) (expense that "`is of value in more than one taxable year'" is a nondeductible capital expenditure); Central Tex. Sav. & Loan Association v. United States, 731 F.2d 1181, 1183 (5th Cir. 1984) ("`While the period of the benefits may not be controlling in all cases, it nonetheless remains a prominent, if not predominant, characteristic of a capital item.'")); see also FMR Corp. & Subs. v. Commissioner, 110 T.C. 402 (1998).

Petitioner argues that as a matter of law it is entitled to deduct the $2.5 million obligation in the year incurred as an expense of terminating the First Lease. Petitioner relies on Rev. Rul. 69-511, 1969-2 C.B. 24; Hall & Ruckel, Inc. v. Commissioner, a Memorandum Opinion of this Court dated Dec. 7, 1942; C. Ludwig Baumann & Co. v. Commissioner, a Memorandum Opinion of this Court dated May 28, 1943; and Denholm & McKay Co. v. Commissioner, 2 B.T.A. 444 (1925), to argue that the law is well established that a payment by a lessee to a lessor in order to terminate a lease is an ordinary and necessary business expense that is deductible under section 162. The rationale underlying these holdings is that payments to terminate a lease are not made to produce future income but are costs incurred and

damages paid in order to be released from an existing unprofitable arrangement.  See also Cassatt v. Commissioner, 137 F.2d 745, 748-749 (3d Cir. 1943), affg. 47 B.T.A. 400 (1942).

Respondent, to the contrary, argues that as a matter of law the obligation to pay the $2.5 million rollover charge must be capitalized and amortized over the 5-year term of the Second Lease.  Respondent relies on INDOPCO, Inc. v. Commissioner, supra, to argue that because the obligation to pay $2.5 million was incurred not only in terminating the First Lease, but also in entering into the Second Lease, the $2.5 million obligation is a cost of obtaining significant future benefits under the Second Lease and should therefore be capitalized over the term of the Second Lease.

Respondent further relies on Pig & Whistle Co. v. Commissioner, 9 B.T.A. 668 (1927), and Phil Gluckstern's, Inc. v. Commissioner, T.C. Memo. 1956-9, to argue in favor of capitalizing the rollover charge.  These were cases of lessees who had made lump-sum payments to purchase leaseholds, which they then amortized over the term of the lease.  Thereafter, the lease in each of these cases was canceled and the parties entered into another lease on the same property.  In both cases the unamortized cost of the first lease was held not to be deductible in the year that the first lease was canceled.  Rather, because of the relationship between the successive leases, the

unextinguished cost of the first lease was regarded as part of the cost of the second lease that had to be amortized over the term of the second lease.

Petitioner argues that terminating the First Lease resulted in an economic loss in the year of termination and that the termination provided no future benefit. Petitioner further argues that Pig & Whistle Co. v. Commissioner, supra, and Phil Gluckstern's, Inc. v. Commissioner, supra, in which the termination fees were capitalized, are distinguishable from the present case. Petitioner maintains that in those cases the lessee canceled a lease only to enter into a second lease of the same property with the same lessor, and that therefore the second lease was in substance a modification of the first lease. In petitioner's view, the payments made to cancel the old lease were therefore actually made to obtain the modifications whose benefit extended throughout the term of the replacement leases. Because the computers covered by the two leases in the case at hand were different from each other, petitioner maintains that the Second Lease was not merely a modification of the First Lease.

The cases brought to our attention by petitioner and respondent occupy opposite ends of a spectrum. At one end is the case where a lessee pays a lessor to terminate a lease and no subsequent lease is entered into between the parties. In such a case the termination fee is clearly deductible in the year

incurred, as there is no second lease raising the possibility that the lessee will realize significant future benefits beyond the current taxable year as a result of the termination payment. At the opposite end is the case of a lessee that cancels a lease and then immediately enters into another lease with the same lessor, covering the same property. In substance, the first lease is not canceled but continues in modified form, and any unrecovered costs of the first lease, or costs incurred to cancel the first lease, are not currently deductible but rather are costs of continuing the first lease in modified form.

The case at hand lies between the two extremes. It is not a case of simply terminating a lease without entering into another lease. Neither is it a termination of one lease, immediately followed by entry into a second lease with the same lessor covering the same property, insofar as the two computers covered by the two leases are not identical. Along the range between the extremes presented by petitioner and respondent, we find the case at hand is both closer to and qualitatively more similar to the modification of lease case than to the simple termination.

We therefore agree with respondent and conclude that petitioner's obligation to pay the rollover charge[4] must be

---

[4] Respondent and petitioner characterize the $2.5 million obligation differently. Petitioner describes the obligation as a "termination fee", while respondent describes it as a "rollover charge". Petitioner, through its characterization of the

(continued...)

capitalized as a cost of acquiring the Second Lease. Our conclusion is informed by the integrated nature of the agreements and transactions by which the First Lease was terminated and the Second Lease was entered into and by the reasoning of Pig & Whistle Co. v. Commissioner, supra, and Phil Gluckstern's, Inc. v. Commissioner, supra.

Petitioner's initiation of the Second Lease and termination of the First Lease were integrated events that should not be viewed in isolation. The Agreement states that the termination of the First Lease is expressly conditioned on petitioner's initiation of a new lease with ICC. In an affidavit attached to petitioner's motion for partial summary judgment, James R. Egan, vice president of U.S. Bancorp, stated: "In 1990, West One determined that the 3090 IBM mainframe computer was inadequate for its needs. West One decided to select a larger capacity computer and to terminate its 3090 Lease with IBM Credit Corporation." Mr. Egan's representations and the fact that the

---

[4](...continued)
obligation, attempts to emphasize the relationship of the obligation to the First Lease while attempting to isolate the obligation from the future benefits provided by the Second Lease. Respondent describes the obligation as a "rollover charge" in order to emphasize the relationship of the obligation to both the First Lease and the Second Lease. We find respondent's characterization of the obligation more appropriate. The Agreement executed by the parties was termed a "rollover agreement", not a "termination agreement", and petitioner's obligation to pay $2.5 million was expressly termed a "rollover charge", not a "termination fee". We therefore generally refer to the obligation throughout as the "rollover charge".

First Lease was terminated upon the express condition that petitioner finance the replacement equipment with ICC indicate that the termination of the First Lease and the initiation of the Second Lease were integrated, not isolated, events. So also, the Term Lease Supplement covering the replacement equipment carries out the Agreement by providing that the rollover charge is financed by being paid with interest over the term of the Second Lease by a series of level payments along with the rental payments under the Second Lease for the replacement equipment.

The rollover charge is therefore properly viewed as a cost of entering into the Second Lease and not merely as an isolated fee for terminating the First Lease. Because the termination of the First Lease and the initiation of the Second Lease were integrated events, the obligation to pay the rollover charge was incurred by petitioner not only to terminate the First Lease but more importantly, as Mr. Egan explains, to obtain a larger capacity computer; that is, to replace the equipment covered by the First Lease with equipment covered by the Second Lease. Petitioner's incurring the obligation to pay the rollover charge therefore is properly characterized as a cost of petitioner's realization of future benefits provided by the Second Lease.

Petitioner's attempt to isolate the rollover charge, as only relating to the First Lease and not providing any future benefits, ignores the integrated character of the termination of

the First Lease and the entry into the Second Lease.  Petitioner fails to acknowledge that the rollover charge was incurred not only to terminate the First Lease, but also to get rid of the inadequate property covered by that lease in order to obtain the right to use the more adequate property covered by the Second Lease.  While petitioner is correct in maintaining that the law is well settled that a payment to terminate a lease is generally deductible in the year incurred, that law does not apply to the case at hand, where the rollover charge is not merely a payment to terminate the First Lease, but also a payment that results in the realization of future benefits over the term of the Second Lease.

Pig & Whistle Co. v. Commissioner, 9 B.T.A. 668 (1927), and Phil Gluckstern's, Inc. v. Commissioner, T.C. Memo. 1956-9, which respondent relies on and petitioner argues are distinguishable, further support our conclusion that petitioner must capitalize the amount of its obligation to pay the rollover charge.  In both those cases, lessees entered into second leases covering the same real property, and in each case the Court stated that the lessor would not have agreed to the cancellation of the old lease except for the execution of the new lease.  In both cases, the Court held that, due to the continuity of rights and strong interrelationship between the two leases, the unextinguished cost of the first lease was part of the cost of the second lease.

Similarly in the case at hand, there is an interrelationship and continuity of rights between the two leases that require the rollover charge to be treated as a cost of acquiring the Second Lease. The cancellation of the First Lease was expressly conditioned on the execution of the Second Lease. The parties to the Second Lease were the same as the parties to the First Lease. While, as petitioner point outs, the properties covered by the two leases are not identical, they are similar in that both are mainframe computers used for the same purposes in petitioner's business. Cf. sec. 1031(a); Redwing Carriers, Inc. v. Tomlinson, 399 F.2d 652 (5th Cir. 1968); Coastal Terminals, Inc. v. United States, 320 F.2d 333 (4th Cir. 1963); sec. 1.1031(a)-1(c), Income Tax Regs.; Rev. Rul. 61-119, 1961-1 C.B. 395.

An analogous case that helps to illustrate the distinction between the two extremes is Great W. Power Co. v. Commissioner, 297 U.S. 543, 546-547 (1936). In that case, the taxpayer called a bond issue at 105 plus accrued interest; under the terms of the bond issue the bondholders had the option to receive series B bonds of equal face value, plus 5 percent in cash. At issue was the treatment of unamortized discount and expenses associated with the first issue of bonds as well as the premiums and other expenses associated with the call of the first issue and the exchange. The Commissioner having conceded that the current deduction of those amounts was proper to the extent attributable to the bonds redeemed for cash, the Supreme Court held that the

remaining amounts had to be capitalized and amortized over the life of the new bonds, just as we hold the full amount of the rollover charge must be capitalized and amortized over the term of the Second Lease.

There is no ground for concluding that the rollover charge is currently deductible in full or for making an allocation under which a portion of the charge would be currently deducted as attributable to the termination of the First Lease and a portion capitalized and amortized over the Second Lease.  Although the apparent paradox--arising from the likelihood that the charge would have been higher if petitioner had not entered into the Second Lease with ICC--gives us pause, any doubts are resolved by the advantage petitioner obtained, by entering into the Second Lease, of being able to finance the charge over the term of the Second Lease.

In sum, we hold that petitioner's obligation to pay the rollover charge is a capital expenditure that is not currently deductible and must be amortized over the 5-year term of the Second Lease.  Respondent has conceded that petitioner, as an accrual basis taxpayer, had accrued a 1-month liability for the rollover charge on December 1, 1990.  As we construe respondent's concession, petitioner is entitled to an amortization deduction of $53,775 for the year 1990, equal to the first installment, which accrued in that year, of the obligation to pay the $2.5

million rollover charge, with interest, over the term of the Second Lease.

To reflect the foregoing,

> An order will be issued
> granting respondent's motion
> for partial summary judgment
> and denying petitioner's motion
> for partial summary judgment.