T.C. Memo. 2004-109


UNITED STATES TAX COURT


BASIN ELECTRIC POWER COOPERATIVE, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 14792-02.                Filed May 3, 2004.


<u>Sue Ann Nelson</u> and <u>Robert J. Stuart</u>, for petitioner.

<u>Reid M. Huey</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

CHIECHI, <u>Judge</u>:  Respondent determined the following defi-
ciencies in petitioner's Federal income tax (tax):

| Taxable Year | Deficiency |
|:---:|:---:|
| 1992 | $123,999 |
| 1993 | 300,475 |
| 1995 | 306,346 |
| 1996 | 1,228,868 |

The issues remaining for decision are:

(1) Should the Court sustain respondent's determination that the expenditures at issue must be capitalized under section 263(a)?[1]  We hold that the Court should.

(2) Should the Court sustain respondent's determination that the period over which the expenditures at issue must be amortized and deducted is the term of certain identical modified sale and leaseback agreements beginning with taxable year 1995 and ending with taxable year 2020?  We hold that the Court should.

### FINDINGS OF FACT

Most of the facts have been stipulated and are so found.

Petitioner had its principal office in Bismarck, North Dakota, at the time it filed the petition in this case.

During the years at issue, petitioner's principal business was the generation and transmission of electrical power to its member rural electrical systems located in an eight-State region of the upper Midwest.  During the late-1970s through the mid-1980s, petitioner constructed new electrical power generating and

---

[1]All section references are to the Internal Revenue Code in effect for the years at issue.  All Rule references are to the Tax Court Rules of Practice and Procedure.

transmission facilities, including the facilities at Antelope Valley Station (AVS facilities).

The AVS facilities consisted of a two-unit electric generating station. The first unit was placed in service in two phases on January 1, 1982, and May 24, 1983. The second unit (AVS unit II) was placed in service on October 29, 1985. The total cost of constructing the AVS facilities was approximately $1.9 billion.

The AVS facilities included pollution control facilities, certain portions of which related solely to the AVS unit II (AVS unit II pollution control facilities). The construction of the AVS unit II pollution control facilities was largely financed through certain tax-exempt bonds issued by Mercer County, North Dakota (Mercer County). In order to effect that financing, Mercer County executed a document, effective as of November 1, 1984, entitled "TRUST INDENTURE" (1984 bond indenture agreement). Pursuant to the 1984 bond indenture agreement, Mercer County issued the Pollution Control Revenue Bonds, 1984 Series (1984 tax-exempt bonds), in the aggregate amount of $112,750,000. The 1984 tax-exempt bonds had an interest rate of 10.5 percent, were payable semiannually on June 30 and December 30, and matured on June 30, 2013. Mercer County had the right to redeem the 1984 tax-exempt bonds prior to maturity but not before December 30, 1994. If Mercer County were to redeem the 1984 tax-exempt bonds between December 30, 1994, and December 29, 1995, the redemption

price was to include a 2 percent, or $2,255,000, premium over the stated aggregate principal amount of such bonds.

On December 5, 1984, Mercer County and petitioner entered into an agreement entitled "LEASE AND SUBLEASE", which was effective as of November 1, 1984 (1984 lease and sublease). Pursuant to the 1984 lease and sublease, petitioner agreed to lease the AVS unit II pollution control facilities to Mercer County, and Mercer County agreed to pay $112,750,000 to petitioner as rent at the beginning of the term of that lease. Pursuant to the 1984 lease and sublease, Mercer County agreed to sublease the AVS unit II pollution control facilities to petitioner, and petitioner agreed to pay to Mercer County as rent "an amount [of money] sufficient to pay, when due, the principal of and premium, if any, and interest on the [1984 tax-exempt] Bonds in funds available at such times to make all payments when due on the Bonds." (We shall refer to the amounts that petitioner was obligated to pay to Mercer County under the 1984 lease and sublease as the 1984 sublease rent.) Petitioner agreed to, and did, issue a promissory note (Basin Electric 1984 note) to evidence its obligation to Mercer County to pay the 1984 sublease rent.

At the time petitioner and Mercer County entered into the 1984 lease and sublease, petitioner intended to transfer by sale or otherwise its interest in the AVS unit II to one or more

transferees and to lease the AVS unit II back from such trans-feree(s).  In this connection, the 1984 lease and sublease allowed petitioner to sell, convey, assign, or otherwise transfer to one or more transferees a percentage undivided interest in the AVS unit II provided that, inter alia, any such transferee assume a portion of petitioner's obligation to pay the 1984 sublease rent (i.e., to make payments when due of interest and principal on the 1984 tax-exempt bonds) which was proportionate to the percentage undivided interest in the AVS unit II that such transferee acquired from petitioner.  Pursuant to the 1984 lease and sublease, if petitioner were to transfer in the aggregate 100 percent of its interest in the AVS unit II, petitioner was to be released from its obligations under the 1984 lease and sublease and the Basin Electric 1984 note.

Each of six unrelated entities (owner participants) wanted to, and did, acquire from and lease back to petitioner a percent-age undivided interest in the AVS unit II.  Those entities acquired in the aggregate 100 percent of petitioner's interest in that unit, and petitioner was released from its obligations under the 1984 lease and sublease.  In order to effect each acquisition and leaseback, on December 3, 1985, each of the six unrelated entities, inter alia, established a grantor trust (grantor trust), which was materially identical to each of the other five

grantor trusts.[2]  The initial trustee (trustee) of each of the six grantor trusts was The Connecticut Bank and Trust Company, National Association (Connecticut Bank).  Thereafter, State Street Bank & Trust Company succeeded Connecticut Bank as the trustee of each of such grantor trusts.

The trustee of each grantor trust entered into various interrelated and interdependent agreements with petitioner, each of which was dated as of November 1, 1985.  (We shall refer to all the various interrelated and interdependent agreements that petitioner and the trustee of each grantor trust entered into as the 1985 sale and leaseback or the 1985 sale and leaseback agreement.[3])  Pursuant to all six of the 1985 sale and leaseback

---

[2]The initial six owner participants and the respective percentage undivided ownership interests in the AVS unit II that they acquired from petitioner were:

| Owner Participant | Percentage Undivided Interest |
|---|---|
| First Chicago Leasing Corporation | 4.3334 |
| Dart & Kraft Financial Corporation | 36.8333 |
| Beatrice Financial Services, Inc. | 10.8333 |
| J.C. Penney Company, Inc. | 30.6667 |
| Saks & Company | 9.0000 |
| Chrysler Financial Corporation | 8.3333 |

[3]Although the trustee of each of the grantor trusts was a party to each 1985 sale and leaseback agreement, each owner participant was the real party in interest to such agreement. Unless otherwise indicated, we shall for convenience when discussing the 1985 sale and leaseback agreement(s) refer to the owner participant(s) and not to the trustee.

(continued...)

agreements, petitioner sold to and leased back from the trustee of the six grantor trusts in the aggregate petitioner's entire interest in AVS unit II, including the AVS unit II pollution control facilities.

The 1984 lease and sublease, the 1984 bond indenture agreement, the 1984 tax-exempt bonds, and the 1985 sale and leaseback agreements were agreements reflecting an integrated plan of interrelated and interdependent transactions or steps.  Each of those transactions or steps was necessary in order to effectuate petitioner's objective of transferring by sale or otherwise the AVS unit II to one or more transferees and leasing that unit back from such transferee(s).

Under the 1985 sale and leaseback, part of the total consideration that the owner participant provided to petitioner to acquire a percentage undivided interest in the AVS unit II consisted of the owner participant's assumption of that portion of petitioner's obligation to pay the 1984 sublease rent (i.e., to make payments when due of interest and principal on the 1984 tax-exempt bonds) which was proportionate to the percentage

[3](...continued)

Each 1985 sale and leaseback agreement that petitioner and the owner participant entered into was materially identical to each of the other five 1985 sale and leaseback agreements. Unless otherwise indicated, we shall for convenience refer only to the 1985 sale and leaseback or the 1985 sale and leaseback agreement and the owner participant.  However, any such references pertain to all six sale and leaseback agreements and all six owner participants.

undivided interest in the AVS unit II that such owner participant acquired from petitioner. The owner participants assumed in the aggregate 100 percent of petitioner's obligation to Mercer County to pay the 1984 sublease rent. Each owner participant agreed to, and did, issue a promissory note (series B secured note) to evidence its obligation to pay that portion of the 1984 sublease rent that it assumed when it acquired from petitioner its percentage undivided interest in the AVS unit II. As a result, pursuant to the 1984 lease and sublease, petitioner was discharged from its obligation under the Basin Electric 1984 note, and the owner participants became the obligors under the 1984 tax-exempt bonds.

Under the 1985 sale and leaseback, the owner participant leased to petitioner its percentage undivided interest in the AVS unit II for a term that began on December 3, 1985, and that was to end on December 30, 2015. Petitioner had the right to extend that lease term for each of two five-year terms. The 1985 sale and leaseback required petitioner to pay a variable amount of money as rent (basic rent) semiannually on June 30 and December 30.[4] With respect to that variable amount of basic rent, the 1985 sale and leaseback provided:

---

[4]The amount of basic rent agreed to was a fixed amount set forth in a schedule to the 1985 sale and leaseback plus or minus an amount calculated by reference to certain specified interest rates set forth in another schedule to the 1985 sale and leaseback.

>      Notwithstanding any other provision of [the 1985 sale
>      and leaseback] * * * the amount of Basic Rent payable
>      [by petitioner] on each Basic Rent Payment Date shall
>      be at least equal to the aggregate amount of principal
>      and interest payable on all Notes then Outstanding
>      * * *.

(We shall refer to the minimum amount of basic rent payable by petitioner under the above-quoted provision of the 1985 sale and leaseback as the "minimum annual basic rent".) The "Notes" referred to in the above-quoted provision of the 1985 sale and leaseback included the series B secured note, which evidenced the owner participant's obligation to pay that portion of petitioner's obligation to pay the 1984 sublease rent (i.e., to make payments when due of interest and principal on the 1984 tax-exempt bonds) which was proportionate to the percentage undivided interest that such owner participant acquired from petitioner.

Under the 1985 sale and leaseback, the minimum annual basic rent was to be adjusted if, inter alia, Mercer County refinanced the 1984 tax-exempt bonds. The 1985 sale and leaseback did not contain a provision under which petitioner had the right to request a refinancing of the 1984 tax-exempt bonds. However, each owner participant had the right under the 1984 bond indenture to require Mercer County to redeem those bonds.

It was petitioner's practice to examine and consider ways to reduce its operating expenses, including its lease expenses. In late 1991, petitioner focused on its rent obligations under the 1985 sale and leaseback, which were based in substantial part on

the interest rates extant in 1984 when Mercer County issued the 1984 tax-exempt bonds, and not on interest rates for tax-exempt bonds issued in 1991. Specifically, on or about December 12, 1991, petitioner initiated a study (refinancing study) regarding the benefits that it would derive in the event of a modification of the 1985 sale and leaseback which would require calculation of the minimum annual basic rent payable by petitioner on the basis of the annual debt service of newly issued tax-exempt bonds bearing the interest rate for such bonds extant at that time.

By January 1992, when petitioner's board of directors met to consider the results of the refinancing study, interest rates on newly issued tax-exempt bonds had declined dramatically to approximately 6.5 percent from the 10.5 percent rate extant in 1984 when Mercer County issued the 1984 tax-exempt bonds. Petitioner determined from the refinancing study that if the 1985 sale and leaseback were modified to require petitioner to pay minimum annual basic rent calculated by reference to tax-exempt bonds issued in early 1992, its minimum annual basic rent obliga- tion would be decreased by approximately $4.2 million. Conse- quently, petitioner concluded that it would attempt to effect a modification of the 1985 sale and leaseback in order to achieve such a substantial reduction in its minimum annual basic rent obligation.

There were three significant hurdles that petitioner faced

in achieving its objective of modifying the 1985 sale and leaseback in order to reduce substantially its minimum annual basic rent obligation. First, pursuant to the terms of the 1984 tax-exempt bonds, such bonds were not redeemable before December 30, 1994. Second, the 1985 sale and leaseback did not allow petitioner to require Mercer County to redeem the 1984 tax-exempt bonds. Third, although each owner participant had the right under the 1984 bond indenture to require Mercer County to redeem those bonds, petitioner did not have the right under the 1985 sale and leaseback to request that the owner participant exercise its right.

Petitioner, in consultation with its lease advisor Morgan Stanley, developed a strategy to overcome the foregoing hurdles. That strategy included petitioner's offering certain inducements to each owner participant and Mercer County in order to persuade them to agree to the modification of the 1985 sale and leaseback and the concomitant refinancing of the 1984 tax-exempt bonds. Thus, petitioner offered (1) to exercise its option under the 1985 sale and leaseback to elect to extend for five years the term of the lease and (2) to pay the costs associated with modifying the 1985 sale and leaseback and effecting the concomitant refinancing of the 1984 tax-exempt bonds.

Petitioner's strategy to overcome the hurdles that it faced in achieving its objective of modifying the 1985 sale and

leaseback was successful, and petitioner, the owner participants, and Mercer County agreed to take the steps necessary to modify and enhance[5] the 1985 sale and leaseback, which included the concomitant refinancing of the 1984 tax-exempt bonds, in order to achieve a substantial rent reduction for petitioner. Specifically, they agreed to certain modifications (1992 amendments) to the 1985 sale and leaseback and to the concomitant transactions necessary to achieve that objective.

On or about December 28, 1992, petitioner and each owner participant[6] modified, effective as of October 1, 1992, the various agreements that comprised the 1985 sale and leaseback. (We shall refer to the 1985 sale and leaseback as modified by the 1992 amendments as the modified 1985 sale and leaseback or the

---

[5]Our use of the word "enhance" with respect to the 1985 sale and leaseback agreements means that the modifications to such agreements (discussed below) resulted in petitioner's having a minimum annual basic rent obligation under such agreements as modified that was significantly more favorable to petitioner than its minimum annual basic rent obligation under the 1985 sale and leaseback agreements.

[6]On Dec. 28, 1992, First Chicago Leasing Corporation, GELCO Corporation, Arbella Leasing Corporation, J.C. Penney Company, Inc., Batus Retail Services, Inc., and Chrysler Financial Corporation were the entities that owned respectively the grantor trusts which held the respective percentage undivided interests in the AVS unit II on behalf of such entities. We shall for convenience continue to use the terms "owner participant" or "owner participants" when referring to one or more of those entities.

modified 1985 sale and leaseback agreement.[7])  Under the modified

1985 sale and leaseback, petitioner agreed to, and did:

(1) Exercise its right under the 1985 sale and leaseback to elect

a five-year extension of the term of the lease[8] and (2) pay the

reasonable costs incurred by the owner participant and Mercer

County in refinancing the 1984 tax-exempt bonds.  With respect to

petitioner's agreement to pay such reasonable costs, the modified

1985 sale and leaseback provided in pertinent part:

> Any Bond Premium and accrued interest in respect of a
> redemption permitted by * * * [the modified 1985 sale
> and leaseback] shall be paid * * * by the Lessee [peti-
> tioner] * * *.  The Lessee shall pay, or shall reim-
> burse the Owner Participant, the Owner Trustee, the
> County, the Bank, the Funding Corp and the Indenture
> Trustee * * * for all out-of-pocket costs and expenses
> paid to unrelated third parties at arm's length (in-
> cluding counsel fees, investment banking fees, fees of
> financial advisors, underwriting fees, * * *) incurred
> by any of such parties in connection with any refunding
> or attempted refunding permitted by or requested pursu-
> ant to * * * [the modified 1985 sale and leaseback].
> * * * the Lessee shall [also] pay to the Owner Partici-
> pant, as additional Supplemental Rent, a tax gross-up
> payment * * *.

In addition, pursuant to all six modified 1985 sale and leaseback

---

[7]The 1992 amendments to each 1985 sale and leaseback were
materially identical.  Unless otherwise indicated, we shall for
convenience refer to the 1992 amendments and the modified 1985
sale and leaseback.  However, any such references pertain to the
1992 amendments to all six 1985 sale and leaseback agreements and
all six modified 1985 sale and leaseback agreements.

[8]Petitioner and the owner participant agreed in the modified
1985 sale and leaseback that petitioner was to pay to the owner
participant semiannual rent of at least $390,006 during the five-
year extension of the term of the 1985 sale and leaseback.

agreements, petitioner agreed to, and did, share with all the owner participants 20 percent in the aggregate of the annual interest savings attributable to the refinancing of the 1984 tax-exempt bonds after petitioner recouped, through a reduction in its minimum annual basic rent obligation, its payment of the costs associated with modifying the 1985 sale and leaseback and effecting the concomitant refinancing of the 1984 tax-exempt bonds.[9]

The 1992 amendments to the 1985 sale and leaseback agreements and the concomitant refinancing of the 1984 tax-exempt bonds, which was achieved through the redemption of those bonds and the issuance of new tax-exempt bonds, were interrelated and interdependent transactions or steps in an integrated plan to

---

[9]Pursuant to all the modified 1985 sale and leaseback agreements, petitioner's minimum annual basic rent was reduced by an amount equal to (1) 100 percent of the annual interest savings attributable to refinancing the 1984 tax-exempt bonds until petitioner recouped its payment of the costs (plus 8.34 percent interest) associated with modifying the 1985 sale and leaseback agreements and effecting the concomitant refinancing of the 1984 tax-exempt bonds and (2) 80 percent of such amount thereafter. In effect, petitioner recouped in 1995 and 1996, through a reduction in its minimum annual basic rent obligation equal to 100 percent of the annual interest savings attributable to refinancing the 1984 tax-exempt bonds, its payment of any reasonable costs incurred by the owner participants and Mercer County in effecting such refinancing. Thereafter, pursuant to all the modified 1985 sale and leaseback agreements, petitioner agreed to, and did, pay to all the owner participants as part of its minimum annual basic rent, inter alia, 20 percent in the aggregate of such annual interest savings. In addition, the minimum annual basic rent was decreased by a portion of the so-called "tax gross-up" payments (discussed below) plus 8.34 percent interest.

achieve petitioner's objective of modifying the 1985 sale and leaseback agreements in order to reduce substantially petitioner's minimum annual basic rent obligation to the owner participants. That integrated plan required execution of not only the 1992 amendments but also other interrelated and interdependent agreements as discussed below.

The 1992 amendments detailed the refinancing of the 1984 tax-exempt bonds, which was to be accomplished through the issuance of new tax-exempt bonds (1995 tax-exempt bonds) by Mercer County in January 1995, in pertinent part as follows:

> **Anticipated Refunding of Initial Series B Secured Note with Proceeds of Refunding Series B Secured Note.**
>
> **Lessee** [Basin Electric] **Election to Initiate Refunding of Initial Series B Secured Note**. In accordance with Subsection 4(c)(i) of the Participation Agreement [of the modified 1985 sale and leaseback], the Lessee has elected to request a refunding of the Initial Series B Secured Note [evidencing the owner participant's obligation to make payments of interest and principal on the 1984 tax-exempt bonds] with the proceeds of an Additional Note issued pursuant to Section 3.5 of the [Trust] Indenture. Such Refunding Series B Note will be purchased by the County [Mercer County] with the proceeds of the sale of its Mercer County, North Dakota, Pollution Control Refunding Revenue Bonds, Series 1995 (the **Refunding Bonds**) [i.e., the 1995 tax-exempt bonds]. The Refunding Bonds will be sold pursuant to a Forward Purchase Contract (the **Refunding Bond Purchase Agreement**) between the County and Morgan Stanley & Co. Incorporated (the date of execution of such Refunding Bond Purchase Agreement hereinafter called the **Refunding Bond Sale Date**) providing for the future delivery of Refunding Bonds on a date (the **Refunding Bond Delivery Date**) shortly after the first optional call date [December 30, 1994] for the [1984 tax-exempt] Bonds. * * * On the Refunding Bond Delivery Date, (i) the

County will issue the Refunding Bonds and purchase the Refunding Series B Secured Note from the Owner Trustee with the proceeds of the Refunding Bonds, (ii) the Owner Trustee will prepay the Initial Series B Secured Note with the proceeds of the sale of the Refunding Series B Secured Note and Supplemental Rent paid by the Lessee, (iii) the County will use the funds received from the Owner Trustee in respect of the prepayment of the Initial Series B Secured Notes to redeem the Bonds * * *.

The modified 1985 sale and leaseback detailed the calculation of petitioner's annual basic rent obligation in pertinent part as follows:

(3)  the amount of Basic Rent payable on each Basic Rent Payment Date following such refinancing [of the 1984 tax-exempt bonds] shall be reduced by the amount of Bond Premium, Owner Participant's Refunding Transaction Expenses and Lessee's [petitioner's] Refunding Transaction Expenses paid by the Lessee in connection with such refinancing and not previously taken into account in any adjustment to Basic Rent plus interest at the Weighted Average Cost of Capital [8.34 percent], compounded semi-annually, on any such amounts paid by the Lessee from the date of payment by the Lessee to the date of recovery through a reduction in Basic Rent pursuant to this Clause 3;

(4)  after the Lessee has recovered the amounts described in paragraph (3) above, the amount of Basic Rent payable on any Basic Rent Payment Date following such refinancing shall be reduced by an amount equal to 80% of the difference between the interest that would have been payable on such Basic Rent Payment Date with respect to the prepaid Series B Secured Note and the interest payable on such Basic Rent Payment Date with respect to the Series B Refunding Note;

As described in the foregoing excerpt from the modified 1985 sale and leaseback, the 1992 amendments did not effect a reduction in petitioner's minimum annual basic rent obligation until the redemption of the 1984 tax-exempt bonds and the issuance of

the new tax-exempt bonds (i.e., the 1995 tax-exempt bonds), which occurred on January 1, 1995.[10]

Pursuant to the modified 1985 sale and leaseback, in 1992 petitioner paid $423,736 to Morgan Stanley for lease advisory fees associated with modifying the 1985 sale and leaseback and $397,339.79 to Mudge, Rose, Guthrie, Alexander & Ferdon (Mudge, Rose) for legal services associated with modifying the 1985 sale and leaseback and as bond counsel for Mercer County in the concomitant refinancing of the 1984 tax-exempt bonds.

The modified 1985 sale and leaseback granted petitioner the right to request the owner participants to take reasonable actions to refinance the 1984 tax-exempt bonds. That modified sale and leaseback required the owner participants to cooperate in order to ensure that such refinancing was implemented.[11]

---

[10]The modified 1985 sale and leaseback changed the definition of "Notes" in the 1985 sale and leaseback to include the series B refunding note. The series B refunding note evidenced the owner participant's obligation to make payments on the 1995 tax-exempt bonds and served a function in the modified 1985 sale and leaseback similar to the function served by the series B secured note in the 1985 sale and leaseback. The series B refunding note was substituted in the modified 1985 sale and leaseback for the series B secured note in determining the minimum annual basic rent due from petitioner under the modified 1985 sale and leaseback after the 1984 tax-exempt bonds were refinanced on Jan. 1, 1995.

[11]The modified 1985 sale and leaseback provided in pertinent part:

The Lessee [petitioner] shall have the right, at its option and upon prior written notice to the Owner

(continued...)

The 1992 amendments expressly stated that petitioner exercised its right to request that the owner participants take reasonable actions to refinance the 1984 tax-exempt bonds. Each owner participant exercised its right under the 1984 bond indenture agreement to require Mercer County to redeem the 1984 tax-exempt bonds.

Pursuant to the plan detailed in the 1992 amendments, Mercer County executed a document entitled "TRUST INDENTURE" (1995 bond indenture agreement), effective as of October 1, 1992, which provided that in order to refinance the 1984 tax-exempt bonds Mercer County was to issue new tax-exempt bonds (i.e., the 1995 tax-exempt bonds) pursuant to the terms of that indenture agreement. Pursuant to that plan, on January 20, 1993, Mercer County entered into a forward purchase contract (forward purchase contract) with Morgan Stanley, pursuant to which Morgan Stanley

_____

[11](...continued)
Participant, to request the Owner Trustee to, and upon any such request and instruction from the Owner Participant, the Owner Trustee shall, [sic] take such actions as are reasonably requested by the Lessee for a refunding [of the 1984 tax-exempt bonds]* * *.* * * The Lessee will provide the written notice contemplated by the first sentence of this Subsection 4(c)(i), along with a description of any documents, agreements and supplements or amendments to Transaction Documents contemplated by the preceding sentence, not less than 90 days prior to any proposed date for a refunding. The Owner Participant agrees that during such 90 day period it will cooperate in connection with the negotiation in good faith of such documents, agreements and supplements as are necessary to implement such refunding. * * *

agreed to offer the 1995 tax-exempt bonds for sale to the public.

Pursuant to the modified 1985 sale and leaseback agreements, in 1993 petitioner paid $984,551.50 to Morgan Stanley for underwriting fees and $113,510.22 to Mudge, Rose for legal services associated with the forward purchase contract and $891,572 in the aggregate to the owner participants for so-called tax gross-up payments required by those agreements.

On January 1, 1995, the refinancing of the 1984 tax-exempt bonds was effected by the simultaneous redemption of the 1984 tax-exempt bonds and issuance of the 1995 tax-exempt bonds. The 1995 tax-exempt bonds had an interest rate of 7.2 percent, were payable semiannually on June 30 and December 30, and matured on June 30, 2013. Because of the 7.2-percent interest rate on the 1995 tax-exempt bonds, the annual interest payment on those bonds was $3,720,750 less than the annual interest payment that would have been due on the 1984 tax-exempt bonds.

During each of the years 1995 and 1996, petitioner's aggregate minimum annual basic rent obligation under the modified 1985 sale and leaseback agreements was reduced by 100 percent of the interest savings attributable to the refinancing of the 1984 tax-exempt bonds, i.e., by $3,720,750. After 1996 and until June 30, 2013, when the 1995 tax-exempt bonds were to mature, petitioner's aggregate minimum annual basic rent obligation under the modified 1985 sale and leaseback agreements was reduced by, inter alia, 80

percent of the interest savings attributable to such refinancing, i.e., by $2,976,600.[12]

Pursuant to the modified 1985 sale and leaseback agreements, in 1995 petitioner paid $54,672.28 to Mudge, Rose for services rendered as bond counsel and other legal services associated with the refinancing of the 1984 tax-exempt bonds, $40,218.22 to Sherman & Sterling for legal services associated with the refinancing of such bonds, $3,499 to Bingham, Dana & Gould for legal services associated with representing the trustee during the refinancing of such bonds, $2,255,000 to First National Bank of Chicago for the redemption premium due on the redemption of such bonds, $14,595.88 to Morgan Stanley for services associated with the issuance of the 1995 tax-exempt bonds, and $17,896.08 to Arthur Andersen for a comfort letter associated with the issuance of such bonds.

Petitioner paid the expenditures described above in order to modify and enhance the 1985 sale and leaseback agreements so that petitioner's aggregate minimum annual basic rent obligation under those modified agreements would be substantially less than its minimum annual basic rent obligation under the 1985 sale and leaseback agreements.

In Forms 1120, U.S. Corporation Income Tax Return, for the taxable years indicated, petitioner deducted the following

---

[12]See _supra_ note 9.

amounts with respect to its payment in 1992, 1993, and 1995 of the expenditures described above (expenditures at issue) relating to the 1992 amendments to the 1985 sale and leaseback agreements and the concomitant refinancing of the 1984 tax-exempt bonds:

| Taxable Year | Amount |
|---|---|
| 1992 | $821,075.79 |
| 1993 | 1,989,633.72 |
| 1995 | [1]2,228,381.46 |

[1] The amount deducted for 1995 is the amount of petitioner's expenditures during that year relating to the 1992 amendments to the 1985 sale and leaseback agreements and the concomitant refinancing of the 1984 tax-exempt bonds reduced by $157,500, which represented petitioner's accrual of certain costs for 1994, a taxable year not at issue. The record does not explain the nature of such costs or why such a reduction of petitioner's 1995 expenditures was made, but the parties agree that the expenditures at issue for 1995 total $2,228,381.46.

Respondent issued a notice of deficiency (notice) to petitioner for its taxable years 1992, 1993, 1995, and 1996. In that notice, respondent determined that the expenditures at issue must be capitalized and amortized and deducted over the term of the modified 1985 sale and leaseback beginning with taxable year 1995 and ending with taxable year 2020. Consequently, respondent further determined in the notice that petitioner is entitled to a deduction of $199,869 for each of its taxable years 1995 and 1996.

## OPINION

Petitioner bears the burden of proving that the determinations in the notice that remain at issue are erroneous. See Rule

142(a); INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); Welch v. Helvering, 290 U.S. 111, 115 (1933). Deductions are strictly a matter of legislative grace, and petitioner bears the burden of proving that it is entitled to any deductions claimed. INDOPCO, Inc. v. Commissioner, supra.

Section 162(a) generally allows a deduction for ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business. In general, an expense is ordinary if it is considered normal, usual, or customary in the context of the particular business out of which it arose. Deputy v. du Pont, 308 U.S. 488, 495 (1940). Ordinarily, an expense is necessary if it is appropriate and helpful to the operation of the taxpayer's trade or business. Commissioner v. Tellier, 383 U.S. 687, 689 (1966); Carbine v. Commissioner, 83 T.C. 356, 363 (1984), affd. 777 F.2d 662 (11th Cir. 1985).

Section 263(a) provides that "No deduction shall be allowed for--(1) Any amount paid out for new buildings or for permanent improvements or betterments made to increase the value of any property or estate." Section 263(a) denies a deduction under section 162(a) when the amount paid or incurred: (1) Creates or enhances a separate and distinct asset, see Commissioner v. Lincoln Sav. & Loan Association, 403 U.S. 345, 354 (1971); Wells Fargo & Co. and Subs. v. Commissioner, 224 F.3d 874, 882 (8th Cir. 2000), affg. in part and revg. in part 112 T.C. 89 (1999);

(2) produces a significant benefit beyond the current taxable year (significant future benefits), see INDOPCO, Inc. v. Commissioner, supra at 87-89; Wells Fargo & Co. and Subs. v. Commissioner, supra at 887; or (3) is in connection with the acquisition of a capital asset, Commissioner v. Idaho Power Co., 418 U.S. 1, 13 (1974).

It is petitioner's position that the expenditures at issue should be deducted under section 162(a) and not capitalized under section 263(a). In support of that position, petitioner argues that it paid the expenditures at issue in order to reduce its future operating costs, viz., the future minimum annual basic rent that the 1985 sale and leaseback required petitioner to pay to the owner participants for the use of the AVS unit II, and that, under Metrocorp, Inc. v. Commissioner, 116 T.C. 211 (2001), and T.J. Enters., Inc. v. Commissioner, 101 T.C. 581 (1993), such expenditures are deductible under section 162(a).

It is respondent's position that the expenditures at issue should be capitalized under section 263(a) and not deducted under section 162(a). In support of that position, respondent argues that petitioner paid the expenditures at issue in order to modify and enhance a capital asset, viz., the 1985 sale and leaseback, and that, under U.S. Bancorp & Consol. Subs. v. Commissioner, 111 T.C. 231 (1998), such expenditures must be capitalized.

The "decisive distinctions" between current expenses and

capital expenditures "'are those of degree and not of kind'",
INDOPCO, Inc. v. Commissioner, supra at 86 (quoting Welch v.
Helvering, supra at 114), with each individual case "'[turning]
on its special facts.'"  Id. (quoting Deputy v. du Pont, supra at
496).  In the instant case, the material facts on which we must
determine whether the expenditures at issue should be capitalized
are not in dispute.  Under the 1985 sale and leaseback,[13] the
amount of basic rent due from petitioner was dependent upon,
inter alia, the amount of interest payable on the 1984 tax-exempt
bonds.[14]  The annual interest rate on the 1984 tax-exempt bonds
was 10.5 percent, and the annual amount of interest payable on
such bonds was $11,838,750.  Thus, the 1985 sale and leaseback
agreements required petitioner to pay in the aggregate at least
$11,838,750 per year in basic rent to the owner participants.

On or about December 12, 1991, petitioner initiated a
refinancing study regarding the benefits that it would derive in
the event of a modification of the 1985 sale and leaseback which

---

[13]We have found that the 1984 lease and sublease, the 1984
bond indenture agreement, the 1984 tax-exempt bonds, and the 1985
sale and leaseback were agreements reflecting an integrated plan
of interrelated and interdependent transactions or steps.  Each
of those transactions or steps was necessary in order to effectu-
ate petitioner's objective of transferring by sale or otherwise
the AVS unit II to one or more transferees and leasing that unit
back from such transferee(s).

[14]The minimum annual basic rent payable by petitioner was
equal to the principal and interest payable on the 1984 tax-
exempt bonds.

would require calculation of the minimum annual basic rent payable by petitioner on the basis of the annual debt service of newly issued tax-exempt bonds bearing the interest rate for such bonds extant at that time. By January 1992, interest rates on newly issued tax-exempt bonds had declined dramatically to approximately 6.5 percent from the 10.5 percent rate extant in 1984 when Mercer County issued the 1984 tax-exempt bonds. Petitioner determined from the refinancing study that if the 1985 sale and leaseback were modified to require petitioner to pay minimum annual basic rent calculated by reference to tax-exempt bonds issued in early 1992, its minimum annual basic rent obligation would be decreased by approximately $4.2 million. Consequently, petitioner concluded that it would attempt to effect a modification of the 1985 sale and leaseback in order to achieve such a substantial reduction in its minimum annual basic rent obligation.

There were three significant hurdles that petitioner faced in achieving its objective of modifying the 1985 sale and leaseback in order to reduce substantially its minimum annual basic rent obligation. First, pursuant to the terms of the 1984 tax-exempt bonds, such bonds were not redeemable before December 30, 1994. Second, the 1985 sale and leaseback did not allow petitioner to require Mercer County to redeem the 1984 tax-exempt bonds. Third, although each owner participant had the right

under the 1984 bond indenture to require Mercer County to redeem those bonds, petitioner did not have the right under the 1985 sale and leaseback to request that the owner participant exercise its right.

Petitioner developed a strategy to overcome the foregoing hurdles. That strategy included petitioner's offering certain inducements to each owner participant and Mercer County in order to persuade them to agree to the modification of the 1985 sale and leaseback and the concomitant refinancing of the 1984 tax-exempt bonds. Thus, petitioner offered (1) to exercise its option under the 1985 sale and leaseback to elect to extend for five years the term of the lease and (2) to pay the costs associated with modifying the 1985 sale and leaseback and effecting the concomitant refinancing of the 1984 tax-exempt bonds.

Petitioner's strategy to overcome the hurdles that it faced in achieving its objective of modifying the 1985 sale and leaseback was successful, and petitioner, the owner participants, and Mercer County agreed to take the steps necessary to modify and enhance the 1985 sale and leaseback, which included the concomitant refinancing of the 1984 tax-exempt bonds, in order to achieve a substantial rent reduction for petitioner. Specifically, they agreed to the 1992 amendments to the 1985 sale and leaseback agreements and to the concomitant transactions necessary to achieve that objective.

On or about December 28, 1992, petitioner and each owner participant modified, effective as of October 1, 1992, the various agreements that comprised the 1985 sale and leaseback. Under the modified 1985 sale and leaseback, petitioner agreed to, and did:  (1) Exercise its option under the 1985 sale and leaseback to elect a five-year extension of the term of the lease[15] and (2) pay the expenditures at issue.  With respect to petitioner's agreement to pay the expenditures at issue, the modified 1985 sale and leaseback provided in pertinent part:

> Any Bond Premium and accrued interest in respect of a redemption permitted by * * * [the modified 1985 sale and leaseback] shall be paid * * * by the Lessee [petitioner] * * *.  The Lessee shall pay, or shall reimburse the Owner Participant, the Owner Trustee, the County, the Bank, the Funding Corp and the Indenture Trustee * * * for all out-of-pocket costs and expenses paid to unrelated third parties at arm's length (including counsel fees, investment banking fees, fees of financial advisors, underwriting fees, * * *) incurred by any of such parties in connection with any refunding or attempted refunding permitted by or requested pursuant to * * * [the modified 1985 sale and leaseback].
> * * * the Lessee shall [also] pay to the Owner Participant, as additional Supplemental Rent, a tax gross-up payment * * *.

In addition, pursuant to all six modified sale and leaseback agreements, petitioner agreed to, and did, share with all the owner participants 20 percent in the aggregate of the annual interest savings attributable to the refinancing of the 1984 tax-exempt bonds after petitioner recouped the expenditures at issue

---

[15]See supra note 8.

through a reduction in its minimum annual basic rent obligation.[16]

We have found that the 1992 amendments to the 1985 sale and leaseback agreements and the concomitant refinancing of the 1984 tax-exempt bonds, which was achieved through the redemption of those bonds and the issuance of the 1995 tax-exempt bonds, were interrelated and interdependent transactions or steps in an integrated plan to achieve petitioner's objective of modifying the 1985 sale and leaseback agreements in order to reduce substantially petitioner's minimum annual basic rent obligation to the owner participants.  That integrated plan required execution of not only the 1992 amendments but also other interrelated and interdependent agreements, including the 1995 bond indenture agreement and the forward purchase contract.

The 1992 amendments detailed the refinancing of the 1984 tax-exempt bonds, which was to be accomplished through the issuance of the 1995 tax-exempt bonds by Mercer County in January 1995, in pertinent part as follows:

> **Anticipated Refunding of Initial Series B Secured Note with Proceeds of Refunding Series B Secured Note.**
>
> **Lessee** [Basin Electric] **Election to Initiate Refunding of Initial Series B Secured Note**.  In accordance with Subsection 4(c)(i) of the Participation Agreement [of the modified 1985 sale and leaseback], the Lessee has elected to request a refunding of the Initial Series B Secured Note [evidencing the owner participant's obli-

[16]See supra note 9.

gation to make payments of interest and principal on the 1984 tax-exempt bonds] with the proceeds of an Additional Note issued pursuant to Section 3.5 of the [Trust] Indenture.  Such Refunding Series B Note will be purchased by the County [Mercer County] with the proceeds of the sale of its Mercer County, North Dakota, Pollution Control Refunding Revenue Bonds, Series 1995 (the **Refunding Bonds**) [i.e., the 1995 tax-exempt bonds].  The Refunding Bonds will be sold pursuant to a Forward Purchase Contract (the **Refunding Bond Purchase Agreement**) between the County and Morgan Stanley & Co. Incorporated (the date of execution of such Refunding Bond Purchase Agreement hereinafter called the **Refunding Bond Sale Date**) providing for the future delivery of Refunding Bonds on a date (the **Refunding Bond Delivery Date**) shortly after the first optional call date [December 30, 1994] for the [1984 tax-exempt] Bonds. * * * On the Refunding Bond Delivery Date, (i) the County will issue the Refunding Bonds and purchase the Refunding Series B Secured Note from the Owner Trustee with the proceeds of the Refunding Bonds, (ii) the Owner Trustee will prepay the Initial Series B Secured Note with the proceeds of the sale of the Refunding Series B Secured Note and Supplemental Rent paid by the Lessee, (iii) the County will use the funds received from the Owner Trustee in respect of the prepayment of the Initial Series B Secured Notes to redeem the Bonds * * *.

The modified 1985 sale and leaseback detailed the calculation of petitioner's annual basic rent obligation in pertinent part as follows:

(3)  the amount of Basic Rent payable on each Basic Rent Payment Date following such refinancing [of the 1984 tax-exempt bonds] shall be reduced by the amount of Bond Premium, Owner Participant's Refunding Transaction Expenses and Lessee's [petitioner's] Refunding Transaction Expenses paid by the Lessee in connection with such refinancing and not previously taken into account in any adjustment to Basic Rent plus interest at the Weighted Average Cost of Capital [8.34 percent], compounded semi-annually, on any such amounts paid by the Lessee from the date of payment by the Lessee to the date of recovery through a reduction in Basic Rent pursuant to this Clause 3;

(4) after the Lessee has recovered the amounts de-
scribed in paragraph (3) above, the amount of Basic
Rent payable on any Basic Rent Payment Date following
such refinancing shall be reduced by an amount equal to
80% of the difference between the interest that would
have been payable on such Basic Rent Payment Date with
respect to the prepaid Series B Secured Note and the
interest payable on such Basic Rent Payment Date with
respect to the Series B Refunding Note;

As described in the foregoing excerpt from the modified 1985 sale and leaseback, the 1992 amendments did not effect a reduction in petitioner's minimum annual basic rent obligation until the redemption of the 1984 tax-exempt bonds and the issuance of the new tax-exempt bonds (i.e., the 1995 tax-exempt bonds), which occurred on January 1, 1995.[17]

The modified 1985 sale and leaseback granted petitioner the right to request the owner participants to take reasonable actions to refinance the 1984 tax-exempt bonds. That modified sale and leaseback required the owner participants to cooperate in order to ensure that such refinancing was implemented.[18]

The 1992 amendments expressly stated that petitioner exercised its right to request that the owner participants take reasonable actions to refinance the 1984 tax-exempt bonds.[19]

_____

[17]The modified 1985 sale and leaseback changed the definition of "Notes" in the 1985 sale and leaseback to include the series B refunding note. See supra note 10.

[18]See supra note 11.

[19]In petitioner's answering brief, petitioner argues that at least certain of the expenditures at issue that it paid after
(continued...)

Each owner participant exercised its right under the 1984 bond indenture agreement to require Mercer County to redeem the 1984 tax-exempt bonds.

Pursuant to the plan detailed in the 1992 amendments, Mercer County executed the 1995 bond indenture agreement, effective as of October 1, 1992, which provided that in order to refinance the 1984 tax-exempt bonds Mercer County was to issue new tax-exempt bonds (i.e., the 1995 tax-exempt bonds) pursuant to the terms of that indenture agreement.  Pursuant to that plan, on January 20, 1993, Mercer County entered into a forward purchase contract with Morgan Stanley, pursuant to which Morgan Stanley agreed to offer the 1995 tax-exempt bonds for sale to the public.

---

[19](...continued)
1992 should not be capitalized because according to petitioner:

> Basin Electric [petitioner] was under no obligation to
> refinance the 1984 [tax-exempt] Bonds.  The expendi-
> tures that Basin Electric would have avoided had it
> decided not to proceed with the refinancing totaled at
> least $3,583,005, including the $2,255,000 call premium
> paid in 1995 * * * relative to the redemption of the
> 1984 Bonds.  [Citations and fn. ref. omitted.]

On the record before us, we reject petitioner's argument. The modified 1985 sale and leaseback granted petitioner the right to request a refinancing of the 1984 tax-exempt bonds.  The 1992 amendments expressly stated that petitioner exercised that right. Once petitioner exercised that right, the owner participants were obligated to cooperate in order to ensure that such refinancing was implemented, and petitioner became obligated under the modified 1985 sale and leaseback to pay the costs associated with modifying the 1985 sale and leaseback and effecting the concomi-tant refinancing of the 1984 tax-exempt bonds.  We must determine the tax treatment of the expenditures at issue based on the facts as they occurred.

On January 1, 1995, the refinancing of the 1984 tax-exempt bonds was effected by the simultaneous redemption of the 1984 tax-exempt bonds and issuance of the 1995 tax-exempt bonds. The 1995 tax-exempt bonds had an interest rate of 7.2 percent, were payable semiannually on June 30 and December 30, and matured on June 30, 2013. Because of the 7.2-percent interest rate on the 1995 tax-exempt bonds, the annual interest payment on those bonds was $3,720,750 less than the annual interest payment that would have been due on the 1984 tax-exempt bonds.

During each of the years 1995 and 1996, petitioner's aggregate minimum annual basic rent obligation under the modified 1985 sale and leaseback agreements was reduced by 100 percent of the interest savings attributable to the refinancing of the 1984 tax-exempt bonds, i.e., by $3,720,750. After 1996 and until June 30, 2013, when the 1995 tax-exempt bonds were to mature, petitioner's aggregate minimum annual basic rent obligation under the modified 1985 sale and leaseback agreements was reduced by, inter alia, 80 percent of the interest savings attributable to such refinancing, i.e., by $2,976,600.[20]

We have found that petitioner paid the expenditures at issue in order to modify and enhance the 1985 sale and leaseback agreements so that petitioner's aggregate minimum annual basic rent obligation under those modified agreements would be substan-

_____

[20]See _supra_ note 9.

tially less than its minimum annual basic rent obligation under the 1985 sale and leaseback agreements.

We conclude that the material facts outlined above bring the expenditures at issue within the purview of U.S. Bancorp & Consol. Subs. v. Commissioner, 111 T.C. 231 (1998).  On the record before us, we reject petitioner's argument that Metrocorp, Inc. v. Commissioner, 116 T.C. 211 (2001), and T.J. Enters., Inc. v. Commissioner, 101 T.C. 581 (1993), require that such expenditures be deducted under section 162(a).[21]  The material facts in Metrocorp, Inc. v. Commissioner, supra, and T.J. Enters., Inc. v. Commissioner, supra, are distinguishable from the material facts in the instant case, and petitioner's reliance on those cases is misplaced.[22]

---

[21]Petitioner argues in the alternative that, even if the expenditures at issue paid in 1992 are required to be capitalized, the expenditures at issue paid in 1993 and 1995 were not directly related to the modification of the 1985 sale and leaseback and should not be capitalized.  On the record before us, we reject that argument.  We have found that there was an integrated plan to modify and enhance the 1985 sale and leaseback agreements in order to reduce substantially petitioner's minimum annual basic rent obligation to the owner participants.  Petitioner's obligation to pay the expenditures at issue was imposed by and had its origins in the 1992 amendments.  See Wells Fargo & Co. and Subs. v. Commissioner, 224 F.3d 874, 884, 886-887 (8th Cir. 2000), affg. in part and revg. in part 112 T.C. 89 (1999).  Petitioner undertook such an obligation in order to induce the owner participants and Mercer County to agree to the integrated plan to modify and enhance the 1985 sale and leaseback agreements so as to reduce substantially petitioner's minimum annual basic rent obligation to the owner participants.

[22]Unlike respondent who argues here that petitioner paid the
(continued...)

In U.S. Bancorp & Consol. Subs. v. Commissioner, supra at 233-234, the taxpayer had a lease for a mainframe computer and paid a fee (rollover fee) in order to cancel that lease and enter into a new lease for a second, more powerful mainframe computer. The Court held that the taxpayer was required to capitalize the rollover fee. Id. at 239. In reaching that holding, the Court observed:

> The cases brought to our attention * * * occupy opposite ends of a spectrum. At one end is the case where a lessee pays a lessor to terminate a lease and no subsequent lease is entered into between the parties. In such a case the termination fee is clearly deductible in the year incurred, as there is no second lease raising the possibility that the lessee will realize significant future benefits beyond the current taxable year as a result of the termination payment. At the opposite end is the case of a lessee that cancels a lease and then immediately enters into another lease with the same lessor, covering the same property. In substance, the first lease is not canceled but continues in modified form, and any unrecovered costs

---

[22](...continued)
expenditures at issue in order to modify and enhance the 1985 sale and leaseback agreements, the Commissioner of Internal Revenue (Commissioner) did not argue in Metrocorp, Inc. v. Commissioner, 116 T.C. 211 (2001), and T.J. Enters., Inc. v. Commissioner, 101 T.C. 581 (1993), that the costs at issue there modified, enhanced, or created a capital asset. The Commissioner argued in those two cases only that the costs at issue there created significant future benefits for the taxpayers there involved. On the record presented in Metrocorp, Inc. v. Commissioner, supra at 222, and T.J. Enters., Inc. v. Commissioner, supra at 592-593, the Court found that there were no significant future benefits requiring capitalization of the costs at issue in those cases. In the instant case, we have found that petitioner paid the expenditures at issue in order to modify and enhance the 1985 sale and leaseback agreements, thereby necessarily providing significant future benefits to petitioner. See Wells Fargo & Co. and Subs. v. Commissioner, supra at 884.

of the first lease, or costs incurred to cancel the first lease, are not currently deductible but rather are costs of continuing the first lease in modified form. [Id.]

In U.S. Bancorp & Consol. Subs., the Court analogized the cancellation of a lease and the execution of a new lease for the same property as in substance a modification of the original lease, which requires that the costs incurred in order to effect such modification be capitalized. Under U.S. Bancorp & Consol. Subs. v. Commissioner, supra at 240 (citing Pig & Whistle Co. v. Commissioner, 9 B.T.A. 668 (1927); Phil Gluckstern's, Inc. v. Commissioner, T.C. Memo. 1956-9), costs paid or incurred to modify a lease, like the expenditures at issue here, must be capitalized and may not be deducted when paid or incurred.

Petitioner argues that U.S. Bancorp & Consol. Subs. is distinguishable from the instant case because in U.S. Bancorp & Consol. Subs. the new lease covered property (i.e., a new more powerful mainframe computer) different from the property that the old lease covered, while in the instant case the modified 1985 sale and leaseback covered the same property that the 1985 sale and leaseback covered. We reject that argument. In U.S. Bancorp & Consol. Subs., the Court found unpersuasive the taxpayer's argument that it was significant that the new lease involved there covered property different from the property that the original lease covered. That argument, according to the Court, ignored the integrated nature of those two leases. U.S. Bancorp

& Consol. Subs. v. Commissioner, supra at 240-241.  If the
rollover fee in U.S. Bancorp & Consol. Subs. paid or incurred to
cancel the original lease covering certain property and to enter
into a new lease covering different property must be capitalized,
a fortiori fees or costs paid or incurred to modify an existing
lease covering the same property, like the expenditures at issue
here, must be capitalized.  See id.; Pig & Whistle Co. v. Commis-
sioner, supra; Phil Gluckstern's, Inc. v. Commissioner, supra.

On the record before us, we hold that petitioner must
capitalize the expenditures at issue.[23]

---

[23]In a footnote in petitioner's opening brief, petitioner
advances for the first time the following alternative argument:

> the lessor's expenses paid by Basin Electric [peti-
> tioner] and recouped through the special allocation of
> the interest savings could be viewed as a "loan" from
> Basin Electric to lessors and a repayment of such loans
> through reduced rent in 1995 and 1996. * * * Under such
> a characterization, Basin Electric would be entitled to
> deduct the unreduced rent for 1995 and 1996 (effec-
> tively allowing Basin Electric to amortize the costs
> over that period).

It is well settled that the Court will not consider issues
raised for the first time on brief when to do so would prevent
the opposing party from presenting evidence that that party might
have proffered if the issue had been timely raised.  DiLeo v.
Commissioner, 96 T.C. 858, 891 (1991), affd. 959 F.2d 16 (2d Cir.
1992); Shelby U.S. Distribs., Inc. v. Commissioner, 71 T.C. 874,
885 (1979).  The determination of whether a debtor-creditor
relationship exists is a highly fact-specific inquiry.  See,
e.g., Ga.-Pac. Corp. v. Commissioner, 63 T.C. 790, 796 (1975).
We conclude that it would be prejudicial to respondent to con-
sider petitioner's alternative argument that certain of the
expenditures at issue constituted a loan from petitioner to the
owner participants.  That is because respondent had no opportu-
(continued...)

We turn now to the dispute between the parties regarding the period over which the expenditures at issue, which we have held must be capitalized, should be amortized and deducted. Petitioner argues that, under section 1.167(a)-3, Income Tax Regs., it should amortize and deduct the expenditures at issue over the two-year period 1995 and 1996. In support of that argument, petitioner points out that 1995 and 1996 are the years during which petitioner recouped the expenditures at issue.[24] Respondent counters that petitioner should amortize and deduct the expenditures at issue over the term of the modified 1985 sale and leaseback beginning with taxable year 1995[25] and ending with taxable year 2020.

We turn first to petitioner's argument that the appropriate

---

[23](...continued)
nity to present evidence at trial relating to whether a bona fide debtor-creditor relationship existed. Consequently, we shall not address petitioner's alternative argument regarding an alleged loan from petitioner to the owner participants.

[24]Under the modified 1985 sale and leaseback agreements, petitioner recouped, through reductions in 1995 and 1996 in its minimum annual basic rent, the entire amount of the expenditures at issue. See supra note 9.

[25]Petitioner paid the expenditures at issue in 1992, 1993, and 1995. The modified 1985 sale and leaseback agreements became effective on Oct. 1, 1992. Pursuant to the terms of the modified 1985 sale and leaseback agreements, petitioner did not realize a substantial reduction in its minimum annual basic rent obligation until after the redemption of the 1984 tax-exempt bonds and the issuance of the 1995 tax-exempt bonds on Jan. 1, 1995. Respondent does not argue that, and therefore we shall not consider whether, the appropriate period over which to amortize and deduct such expenditures should begin with taxable year 1992.

period over which to amortize and deduct the expenditures at issue is 1995 and 1996. Section 1.167(a)-3, Income Tax Regs., on which petitioner relies in support of that argument, states that an intangible asset may be the subject of a depreciation allowance if that intangible asset has an ascertainable, limited useful life. Petitioner has not offered any evidence establishing that the useful life of the modified 1985 sale and leaseback is only the two-year period 1995 and 1996. That petitioner in effect recouped the expenditures at issue over 1995 and 1996 pursuant to the terms of the modified 1985 sale and leaseback agreements does not establish that the useful life of each of those agreements is that two-year period. On the record before us, we reject petitioner's argument that section 1.167(a)-3, Income Tax Regs., requires that the expenditures at issue be amortized and deducted over the two-year period 1995 and 1996.

We turn now to respondent's argument that the appropriate period over which to amortize and deduct the expenditures at issue is the term of the modified 1985 sale and leaseback agreements beginning with 1995 and ending with 2020. The Supreme Court of the United States has concluded that "a capital expenditure usually is amortized and depreciated over the life of the relevant asset". INDOPCO, Inc. v. Commissioner, 503 U.S. at 83-84. Petitioner cites no authority that would take the instant

case outside the purview of that general rule.[26]  Moreover, U.S. Bancorp & Consol. Subs. v. Commissioner, 111 T.C. at 242, and Pig & Whistle Co. v. Commissioner, 9 B.T.A. at 670, held that costs paid or incurred to cancel a lease and enter into a new lease must be amortized and deducted over the term of the new lease. On the record before us, we find that petitioner is required to amortize and deduct the expenditures at issue over the term of the modified 1985 sale and leaseback agreements ending with taxable year 2020.[27]

Based on our examination of the entire record before us, we find that petitioner has failed to carry its burden of establishing that the Court should not sustain respondent's determinations that the expenditures at issue should be capitalized and amortized and deducted over the term of the modified 1985 sale and leaseback agreements beginning with taxable year 1995 and ending

---

[26]In a footnote in petitioner's opening brief, petitioner advances for the first time an alternative argument that, because petitioner's minimum annual basic rent obligation was reduced only throughout each of the years during which the 1995 tax-exempt bonds were outstanding, the expenditures at issue should be amortized and deducted over the term of such bonds, which were to mature on June 30, 2013.  Petitioner cites no authority in support of that alternative argument.  On the record before us, we reject it.

[27]Respondent does not argue that, and we have not considered whether, the amortization and deduction of the expenditures at issue should begin with taxable year 1992.  See supra note 25.

with taxable year 2020.[28]

We have considered all of the contentions and arguments of petitioner and respondent that are not discussed herein, and we find them to be without merit, irrelevant, and/or moot.

To reflect the foregoing and the concessions of the parties,

<u>Decision will be entered</u>

<u>under Rule 155</u>.

---

[28]See <u>supra</u> note 27.